[Cite as *State v. Banks*, 2021-Ohio-4330.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-200395 |
| | | C-200396 |
| Plaintiff-Appellee, | : | TRIAL NOS. 20CRB-14949A |
| | | 20CRB-14949B |
| vs. | : | |
| AARON BANKS, | : | *O P I N I O N.* |
| Defendant-Appellant. | : | |

Criminal Appeals From:  Hamilton County Municipal Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 10, 2021

*Andrew Garth,* City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Jon Vogt*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1} Defendant-appellant Aaron Banks was charged with and found guilty of two counts of cruelty against a companion animal in violation of R.C. 959.131(B). In his first assignment of error, Banks argues that he was denied his constitutional right to confront witnesses against him. In his second assignment of error, Banks asserts that his convictions were based on insufficient evidence and against the manifest weight of the evidence. For the following reasons, we overrule both assignments of error and affirm the judgment of the trial court.

## Procedural History

{¶2} Aaron Banks was charged with two counts of cruelty against a companion animal in violation of R.C. 959.131(B), misdemeanors of the second degree. Banks pleaded not guilty, and the case proceeded to a bench trial on October 27, 2020. The trial court found Banks guilty and sentenced him to 180 days on each count—suspended 150 days, committed 30 days—to be served concurrently, and three years of community control. The trial court also ordered that both dogs be forfeited to Cincinnati Animal Care with reimbursement for necessary costs, ordered that Banks not own any companion animals for 15 years, and ordered Banks to undergo a psychological evaluation and treatment as recommended.

## Factual Background

### *Objection to Use of Zoom Technology*

{¶3} At the start of trial, counsel for Banks addressed the court and expressed an objection to any testimony by Zoom technology, arguing that unavailability of a witness due to a subpoena not being served was insufficient grounds to dispense with Bank's right to face-to-face confrontation. The state asserted that a witness, Mark Curnutte, did not receive the subpoena and could only

2

be available by Zoom, and argued that he is a critical witness and should be allowed to testify by Zoom, as it has become a normal occurrence with the COVID-19 pandemic. Alternatively, the state asked the court to hear the case in its entirety and then continue the case in progress for in-person testimony at a later date. The court responded as follows:

> This court was just put under a joint administrative order, Judge Kubicki and Judge Russell filed October 26th, 2020, we were one of the numerous counties in a red alert level 3 emergency due to Covid. They asked us to try to limit in person interactions, gatherings, try to conduct hearings when possible, using technology. Ohio Supreme Court has given similar instructions due to Covid. So, I will allow both direct and cross-examination to be conducted by Zoom technology for this witness.

*Testimony of Diana Lara Curnutte*

{¶4} Diana Lara Curnutte is a neighbor of Banks. On August 2, 2020, she heard "yelping and the screaming of dogs" on the balcony just behind her. She also heard a man's voice. She then went up to the top level of her house, the fourth floor, where her husband was. She pulled out her phone and started videotaping from that point "where the dogs were scurring [sic] around the deck." She testified, "I then saw the defendant, and heard him, but he had taken a giant crate and threw it right at the dogs. The dogs were then yelping again, and this just went on for – I videotaped it and was very upset." The incident went on for around eight to ten minutes before she started recording, and for "probably 10 minutes" once she started recording.

*Testimony of Mark Curnutte via Zoom Technology*

{¶5} On August 2, 2020, Mark Curnutte was at home with his wife. At around 9:30 a.m., he was alerted to look out an open window after hearing dogs barking, yelping, and crying. Out of the fourth-floor window, he observed Banks "beating two dogs." Banks was "beating the larger dog repeatedly with what appeared to be a stick or a rod," and the smaller dog was "cowering in the corner behind the protection of the larger dog." The larger dog was absorbing most of the blows. He did not count how many strikes occurred on the dogs, but "it wasn't just one or two." He believed it to be around ten to 15 strikes. His wife videotaped the "second beating" which occurred roughly 20 to 30 minutes later. During this second incident, he saw Banks throw a crate at one of the dogs but could not tell if the crate hit the dogs because of the railing. When asked how hard Banks hit the dogs, he replied, "It appeared to be out of anger and with the defendant's full strength." The strikes were on the side of the dog, but not on the head.

{¶6} He testified that, during the course of this case, Banks hung "some sort of screen, whether it was a sheet or curtain." He believed it was to shield the view or prevent them from seeing the deck. The statement on the screen was, "Racist, Liars, Mazola." Mazzola is another neighbor.

{¶7} When asked where he was during his remote testimony, he said he was at home in Mount Adams. He stated, "I had grading to do, and I did not receive a summons from the Court, and I had other arrangements, including web office hours with students this morning because that is how we are required to do our office hours because of the pandemic." When asked if his work was the only thing keeping him from being present in court, he responded, "I did not receive a summons from the

4

court," and "I was not showered or shaved, and I did not have a chance to come to court appropriately dressed."

*Testimony of Samantha Lakamp*

{¶8}   Samantha Lakamp was at her boyfriend's house on August 2, 2020. She could see Banks's balcony from their balcony.  She was in bed and "woke up to the sound of dogs yelping and crying."  At first, she dismissed the noise, but it kept going on "excessively for I would say 10 to 15 minutes."  At that point, she went out on the balcony and saw Banks holding what looked like a "tennis ball thrower," or a three-foot-long plastic object.  He raised the object and hit the dog with it.  The dog ran around to the other corner of the deck.  Then Banks picked up a plastic dog crate and threw it at the dog.  She saw two dogs that day.  She described the strike as Banks raising the object "about to his head" and then bringing it down on the dog. After the strike, the dogs yelped, had their tails between their legs and ran to the other side of the deck.  She did not know how long this was going on before she woke up.  She could not see the dog when the crate hit it.  She did not have any reason to believe that the crate did not actually hit the dog.  After the crate hit the dog, she saw the dog run out from under the crate.

*Testimony of Melissa Mazzola*

{¶9}   Melissa Mazzola's house is down a hill, two houses to the right of Banks's apartment.  Part of her view was obstructed by trees and greenery, but "not tall enough to hide the entire balcony."  Early in the morning on August 2, 2020, her dogs alerted her by whining and barking.  She then heard "this familiar whining and yelping of these dogs, and barks, behind my house, and I said 'not again.' "  She then went outside on her back deck and heard the dogs continuously crying.  She then called for her husband and said, "Randy, it's happening again."  She heard dogs

crying and yelping for 15 minutes, saw a crate being thrown at the whimpering dogs, and saw the dogs "scurring [sic] away from the crate that was being thrown at them in a corner." The man she saw on the balcony was Banks. She testified that, the next day, "there was a sign that was hanging in the back of his deck that was directed to me, it said 'Racist, Liars, Mazzola,' misspelled, but I mean, obviously it was directed—my last name is Mazzola."

*Testimony of Lieutenant William Allen*

{¶10} Lieutenant William Allen is with the Hamilton County Dog Warden's office. He investigated a claim of dogs being beaten on the back or rear balcony. He arrived shortly after 10 a.m. on August 2, 2020, and spoke with Banks directly. Banks kept trying to make him believe that the dogs were well cared for and that the dogs meant everything to Banks. When he asked Banks about the beating, Banks said, "Well, what are you supposed to do when they shit everywhere." Lieutenant Allen testified that while Banks did not admit to it, "he didn't outright deny it either." Banks was defensive and upset.

{¶11} Lieutenant Allen found the dogs on the rear balcony. When he got there, the dogs were terrified. He testified, "When they saw me they retreated, screaming, went to get away from him." He explained, "There was [sic] feces on the deck, and I was trying to earn the dog's trust at the time." The dogs tried to get as far away from him as possible when he approached them. He was able to walk them out on leashes. He removed the dogs for their safety and their welfare because he believed what he was told to be true. He saw the video and talked to the witnesses at the scene who described what they saw. He testified that because dogs have fur, you cannot see bruising. The dogs appeared healthy and did not show any obvious injuries.

*Testimony of Albert Federman*

**{¶12}** Albert Federman is Banks's landlord and neighbor. He lives directly above him. He denied being friends with Banks. On the morning of August 2, 2020, he "heard a couple dogs yelping for a matter of moments." He testified that it was probably somewhere around five to ten seconds. He came to court because he told Banks he did not think he abused his animals and offered to testify if Banks needed him to. He did not see anything that day. He remembers letting the lieutenant into the complex. He then went right back to his apartment.

*The Trial Court's Ruling*

**{¶13}** The court stated:

In this day and age people are often reluctant to call the police on their neighbors, and it's got to be pretty significant usually for multiple neighbors to all become alarmed and call over to people about it, call the police, and that's exactly what this was. The state proved beyond a reasonable doubt that the defendant knowingly, cruelly beat these two dogs, repeatedly striking the dogs with this stick, also throwing the crate on the dogs for extended beating, according to multiple witnesses, and there's no question in my mind that the defendant is guilty of both charges.

**Law and Analysis**

*First Assignment of Error*

**{¶14}** In his first assignment of error, Banks asserts that he was denied the right to confront witnesses against him in violation of the Sixth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution. "While admission of testimony is generally reviewed for an abuse of discretion, the question

7

of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed de novo." *In re H.P.P.*, 8th Dist. Cuyahoga Nos. 108860 and 108861, 2020-Ohio-3974, ¶ 19, citing *State v. Smith*, 162 Ohio App.3d 208, 2005-Ohio-3579, 832 N.E.2d 1286, ¶ 8 (8th Dist.).

{**¶15**} "Under both the federal and Ohio constitutions, a criminal defendant has a right to confront witnesses." *Id.* at ¶ 20. The Sixth Amendment to the United States Constitution requires that, "[i]n all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him."

Section 10, Article I of the Ohio Constitution provides that 'the party accused shall be allowed * * * to meet the witnesses face to face * * *; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. * * *'

(Ellipses sic.) *State v. Self*, 56 Ohio St.3d 73, 76, 564 N.E.2d 446 (1990).

{**¶16**} "The Confrontation Clauses were written into our Constitutions '*to secure for the opponent the opportunity of cross-examination*. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' " (Emphasis in original.) *Id.*, quoting 5 Wigmore, *Evidence* 150, Section 1395 (1974).

{¶17} "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.' " *Coy v. Iowa*, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). "A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking facts.' " *Id.* at 1019.

{¶18} "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct.3157, 111 L.Ed.2d 666 (1990). The Confrontation Clause guarantees not only the right to a personal examination, but also ensures that witness statements are given under oath, that the witness submits to cross-examination, and that the trier of fact is able to observe the witness's demeanor and assess his or credibility. *Id.* at 845-846. "The combined effect of these elements of confrontation – physical presence, oath, cross-examination, and observation of demeanor by the trier of fact – serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." (Citations omitted.) *Id.* at 846.

{¶19} However, "[t]he Confrontation Clause does not guarantee criminal defendants an *absolute* right to a face-to-face meeting with the witness against them at trial." *Id.* at the syllabus. The right " 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.* at 849, citing *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further

an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. "[T]he presence of [the] other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851. When determining whether dispensing with the face-to-face requirements is necessary to further an important public policy, the trial court must hear evidence and make a case-specific finding of necessity. *Id.* at 855.

{¶20} The Supreme Court of Ohio has stated, "Our interpretation of Section 10, Article I [of the Ohio Constitution] has paralleled the United States Supreme Court's interpretation of the Sixth Amendment: the primary purpose of our Confrontation Clause 'is to provide the accused an opportunity for cross-examination.' " *Self*, 56 Ohio St.3d at 78, 564 N.E.2d 446, citing *Henderson v. Maxwell*, 176 Ohio St. 187, 188, 198 N.E.2d 456 (1964).

> Though our Constitution uses the specific phrase 'face to face,' that phrase has not been judicially interpreted at its literal extreme. This is because the purpose of the 'face to face' clause of the Ohio Constitution (as well as the parallel provision of the Sixth Amendment) is to guarantee the opportunity to cross-examine and the right to observe the proceeding. Taking the phrase 'face to face' to its outer limits, one could argue that a witness who looks away from the defendant while testifying is not meeting the defendant 'face to face.' As we have indicated, a criminal defendant is ordinarily entitled to a physical confrontation with the accusing witnesses in the courtroom. Yet, the value which lies at the core of the Confrontation Clauses does

not depend on an 'eyeball to eyeball' stare-down. Rather, the underlying value is grounded upon the opportunity to observe and cross-examine. The physical distance between the witness and the accused, and the particular seating arrangement of the courtroom, are not at the heart of the confrontation right.

(Citation omitted.) *Id.* at 79.

{¶21} Thus, the face-to-face language in the Ohio Constitution has not been interpreted as literal but has instead been read as requiring the opportunity to observe and cross-examine. *See id.* Therefore, under our current precedent, " 'Section 10, Article I provides no greater right of confrontation than the Sixth Amendment.' " *Id.*; *see State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12.

{¶22} Accordingly, Ohio has established a two-part test "for determining whether an alternative to face-to-face confrontation qualifies as an exception to the Confrontation Clause":

the procedure must (1) be justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontation – oath, cross-examination, and observation of the witness's demeanor.

*State v. Howard*, 2020-Ohio-3819, 156 N.E.3d 433, ¶ 53 (2d Dist.), citing *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, ¶ 14.

{¶23} Banks argues that the trial court's decision to allow Mark Curnutte to testify via Zoom technology was not based on an important state interest, public policy, or necessities of the case because, while the trial court relied on an administrative order to limit in-person appearances due to the COVID-19 pandemic,

11

the witness himself did not express any concerns about COVID-19 nor was there any evidence that the witness was in a high-risk group for exposure to COVID-19.

{¶24} Preventing the spread of COVID-19 is an important public policy that may warrant an exception to face-to-face confrontation under the appropriate circumstances. *See United States v. Donziger*, S.D.N.Y. Nos. 19-CR-561 and 11-CV-691, 2020 WL 5152162, *2 (August 31, 2020) ("With respect to the <u>Craig</u> standard, there is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies."). The Ohio Supreme Court has acknowledged the importance of preventing the spread of COVID-19 and found that, "[d]uring this public-health emergency, a judge's priority must be the health and safety of court employees, trial participants, jurors, and members of the public entering the courthouse." *In re Disqualification of Fleegle*, 161 Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609 ¶ 8 (Finding that, "[b]y failing to follow the Ohio Department of Health and Governor DeWine's directives, a judge endangers the health of those who enter the courthouse and their families," and disqualification of a judge may be sought if, "attorneys or litigants believe that judges are not taking seriously recommendations from this court, the governor, or other public-health officials, and that as a result the health of trial participants, jurors, or the public is at risk.").

{¶25} There is no question that the witness's expressed justifications alone are inadequate to warrant an exception to the face-to-face requirement in this case. However, the trial court permitted the remote testimony, not because of the excuses of the witness, but in order to limit in-person contact and interactions and comply with the judicial administrative order put in place in response to the heightened pandemic status at the time of trial in order to protect everyone who enters the

12

courthouse. Thus, the question in this case is about more than just witness convenience. The question is whether the circumstances are appropriate to warrant an exception to the face-to-face requirement where the trial occurs in the middle of a public-health emergency due to COVID-19, in a county on red-alert level three, where the trial court has been issued orders to limit in-person appearances as much as possible and to instead utilize technology, and where the trial court relies on these circumstances when making a case-specific decision to allow a witness, who did not receive a subpoena and who the state characterizes as a critical witness, to testify remotely, even though the witness himself did not express any COVID-19 concerns. Put another way, must the witness have expressed COVID-19 concerns in the context of the surrounding global pandemic occurring at the time of trial in order to warrant an exception to the face-to-face requirement or was the trial court permitted to rely on the specific circumstances of the case beyond the witness himself?

{¶26} We reserve this question for another day as we find that, even if there was a violation of the confrontation clause, any error was harmless error. "A reviewing court may overlook an error where the remaining admissible evidence, standing alone, constitutes 'overwhelming' proof of a defendant's guilt." *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573, ¶ 25 (8th Dist.), citing *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983). Even without considering Mark Curnette's testimony, there was additional testimony from another witness that Banks struck one of his dogs. Also, multiple witnesses testified that he threw a crate at both dogs. The video in evidence shows Banks throwing a large crate at the dogs and shows the crate hit both of the dogs. Further, multiple witnesses testified that the dogs were yelping and crying when this was occurring. Finally, the lieutenant with the dog warden's office testified that, when asked about the abuse allegations,

Banks replied, "Well, what are you supposed to do when they shit everywhere." This evidence alone is sufficient to support the convictions. *See State v. Miner*, 2020-Ohio-5600, 164 N.E.3d 512, ¶ 31 (5th Dist.) (Finding evidence that the appellant punched a dog sufficient to support a finding that the appellant knowingly committed an act of cruelty against a companion animal.). Accordingly, this assignment of error is overruled.

*Second Assignment of Error*

{¶27} In his second assignment of error, Banks challenges the sufficiency and manifest weight of the evidence and argues that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of cruelty against a companion animal.

{¶28} "In a challenge to the sufficiency of the evidence, the question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt." *State v. Hill*, 1st Dist. Hamilton Nos. C-190638, C-190639, C-190640 and C-190641, 2021-Ohio-294, ¶ 11, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In contrast, when considering a challenge to the weight of the evidence, the court must examine the entire record, weigh all the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the court clearly lost its way and created a manifest miscarriage of justice." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶29} R.C. 959.131(B) provides, "No person shall knowingly torture, torment, needlessly mutilate or maim, cruelly beat, poison, needlessly kill, or commit an act of cruelty against a companion animal." R.C. 959.131(A)(2) provides, " 'Cruelty,'

14

'torment,' and 'torture' have the same meanings as in section 1717.01 of the Revised Code." R.C. 1717.01 (B) provides, " 'Cruelty,' 'torment,' and 'torture' include every act, omission, or neglect by which unnecessary or unjustifiable pain or suffering is caused, permitted, or allowed to continue, when there is a reasonable remedy or relief."

{¶30} Banks argues that the evidence fails to show that he needlessly beat his dogs, as alleged in the complaints. However, two separate witnesses testified that Banks struck his dogs with a stick-like object and multiple witnesses testified that he threw the crate at the dogs. The video in evidence also shows Banks throwing the crate at the dogs and shows the crate hitting the dogs. Additionally, multiple witnesses testified that the dogs were yelping and crying when this was occurring. Finally, the lieutenant with the dog warden's office testified that, when asked about the abuse allegations, Banks replied, "Well, what are you supposed to do when they shit everywhere." Viewing the evidence in a light most favorable to the state, a rational trier of fact could have found all the elements proven beyond a reasonable doubt. *See Miner*, 2020-Ohio-5600, 165 N.E.3d 512, at ¶ 31 (Finding evidence that the appellant punched a dog sufficient to support a finding that the appellant knowingly committed an act of cruelty against a companion animal.).

{¶31} Banks alternatively argues that his convictions were against the manifest weight of the evidence. The only contradictory testimony presented by Banks was the testimony of his landlord. While Bank's landlord did testify that the barking or yelping only lasted a few seconds, several witnesses for the state testified that the barking or yelping lasted for over 15 minutes. No other evidence was contradicted. Thus, when viewing and weighing all the evidence, it cannot be determined that the trial court clearly lost its way and created a manifest miscarriage

15

of justice. Having concluded that the convictions are based on sufficient evidence and not against the manifest weight of the evidence, we overruled this assignment of error.

## Conclusion

**{¶32}** Having considered and overruled Banks's two assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**WINKLER, J.,** concurs.
**BERGERON, J.**, concurs separately

**BERGERON, J.**, concurring separately.

**{¶33}** Inconsistent guidance regarding the status of the criminal defendant's confrontation right under Ohio's Constitution punctuates our caselaw. At times, courts have lauded Ohio's confrontation right, recognizing that it requires face to face confrontation in nearly all cases. But at other times, courts have tethered Ohio's confrontation right to the United States Supreme Court's confrontation jurisprudence, which has meandered about somewhat. In the midst of a global pandemic—one that has disrupted our lives, as well as the ordinary administration of justice—we need better certainty on the status of Ohio's confrontation right. I concur separately to draw attention to this predicament.

I.

**{¶34}** Under Article I, Section 10 of our current Ohio Constitution "the party accused shall be allowed to appear and defend in person and with counsel * * * to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf." Both the 1851 and 1802 Ohio Constitutions contained similar language. *See* Ohio Constitution of 1851, Article I, Section 10

16

("[T]he party accused shall be allowed to appear and defend in person and with counsel * * * to meet the witnesses face to face, and have compulsory process to procure the attendance of witnesses in his behalf."); Ohio Constitution of 1802, Article VIII, Section 11 ("[T]he accused hath a right to be heard by himself and his counsel * * * to meet the witness face to face; to have compulsory process for obtaining witnesses in his favor."). When that provision was amended in 1912, the framers recognized a need for an exception, carving out an exception for out-of-court depositions. But in so doing, this newly-added clause retained the significance of the "face to face" requirement: "[P]rovision may be made by law for the taking of the deposition by the accused or by the state * * * always securing to the accused means and the opportunity to be present in person * * * and to examine the witness face to face as fully and in the same manner as if in court." Thus, in two separate places in Section 10, our Constitution underscores the importance of the "face to face" concept. *Id.*

{¶35} The Sixth Amendment to the United States Constitution, on the other hand, secures the right "to be confronted with the witnesses against [the criminal defendant]; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." Notably, it does not say that the confrontation must be "face to face."

{¶36} Building on our constitutional language, in the mid-nineteenth century, Ohio courts identified the criminal defendant's right to "meet his witnesses face to face" as an essential component of Ohio's Constitution. *See Farrington v. State*, 10 Ohio 354, 356 (1841) ("It is a fundamental principle in this state, that in criminal prosecutions the accused has not only the right to be heard, by himself or counsel, but to meet his witnesses face to face; to require the testimony against him

17

to be under the sanction of an oath, and the witnesses to be subject to any competent cross-examination."); *Kirk v. State*, 14 Ohio 511, 513 (1846) ("[C]areful has been the constitution to secure the pure and impartial administration of criminal justice, and to guard the accused from the possibility of oppression and wrong, under the forms of a criminal prosecution. It is [the criminal defendant's] right to have a *public trial*, that he shall meet the witnesses face to face, before the public; and that all that can be said or preferred against him, and all that can be said or urged in his favor, shall be in the hearing and presence of the public." (Emphasis sic.)).

{¶37} Shortly after the promulgation of the 1851 Constitution, the Supreme Court emphasized that the confrontation right "is a constitutional guaranty of one of the great fundamental privileges well established," and that our Constitution was intended "to give it permanency, and secure it against the power of change or innovation." *Summons v. State*, 5 Ohio St. 325, 340 (1856). As the court described this right, it explained that the crux of the confrontation right was "the personal presence of the witnesses." *Id.* at 341.

{¶38} During the balance of the nineteenth century, at least two Supreme Court cases reaffirmed the significance of the "face to face" requirement. *See Wheeler v. State*, 34 Ohio St. 394, 398 (1878) ("A coroner's inquest with us is of such a nature, that to admit it, against the objection of the accused, would violate that clause of the bill of rights which entitles him to meet the witnesses face to face."); *Griffin v. State*, 34 Ohio St. 299, 304 (1878) ("[N]o doubt that the prisoner had a constitutional right (art. 1, § 10) to appear in court at his trial, and defend in person and by counsel, and to meet the witnesses face to face, before an impartial jury."). To be sure, the Supreme Court recognized common law hearsay exceptions during this time, a category of exceptions that would subsequently expand with the

18

modernization of hearsay law and exclusions. *See, e.g., Summons* at 334 (admission of dying declaration against criminal defendant does not violate the face to face requirement).

**{¶39}** Shortly after the turn of the twentieth century, the Supreme Court began linking the interpretation of Ohio's confrontation right with that of the Sixth Amendment. In *State v. Wing*, the court considered whether an individual could repeat testimony he heard at a preliminary hearing in light of witness unavailability for trial. *State v. Wing*, 66 Ohio St. 407, 418-419, 64 N.E. 514 (1902). The court held that admission of this testimony would violate the confrontation requirement, relying on a United States Supreme Court case—*Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900). *Id.* Although the court reaffirmed the importance of the confrontation requirement, cautioning that it "should not, except for the best of reasons, be weakened, invaded, or destroyed[,]" this mingling of the United States Supreme Court's Sixth Amendment jurisprudence with the Ohio confrontation analysis may have done exactly that which the court admonished against. *Id.* at 425.

**{¶40}** Further steps along this path led to a gradual erosion of the independent significance of Article I, Section 10. By the 1980s, courts viewed Ohio's "face to face" requirement as synonymous with the confrontation requirement under the United States Constitution. In *State v. Madison*, the Supreme Court rejected the "claim[] that [Article I, Section 10] is more demanding of a face-to-face confrontation than that of the United States Constitution." *State v. Madison*, 64 Ohio St.2d 322, 330, 415 N.E.2d 272 (1980). One year later, the Supreme Court held that " 'a primary interest secured by [the confrontation requirement] is the right of cross-examination,' " which could be adequately protected " 'even in the absence of

physical confrontation.' " *State v. Spikes*, 67 Ohio St.2d 405, 412, 423 N.E.2d 1122 (1981), quoting *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). But this new confrontation analysis was ill-defined, with the court recognizing the need for "exceptions when public policy and the necessity of the case so warrant." *Madison* at 325. In other words, the confrontation right could be curbed with nothing more than a judicial whim.

{¶41} A few years later, the Supreme Court tied some of these threads together in holding that "Section 10, Article I of the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment." *State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990). The *Self* decision unceremoniously dismissed the text of the Ohio Constitution, writing "[l]iteral face-to-face confrontation is not [an essential condition] of the confrontation right. * * * [P]hysical confrontation may constitutionally be denied where the denial is necessary to further an important public policy and 'the reliability of the testimony is otherwise assured.' " *Id.* at 77, quoting *Maryland v. Craig*, 497 U.S. 836, 850, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The *Self* court cited just one authority for the proposition that "face to face" has not been interpreted literally—Justice Brown's dissent in *Madison*. *Self* at 79, citing *Madison* at 332 (Brown, J., dissenting). But Justice Brown made the *opposite* point that "[t]he language in the Ohio Constitution must be read to give a defendant greater rights to confrontation and cross-examination than that given under the federal constitution." *Madison* at 333 (Brown, J., dissenting).

{¶42} Just three years after *Self*, the Supreme Court appeared to resuscitate Article I, Section 1o in *State v. Storch*, a case involving the sexual assault of a child under the age of 13. *State v. Storch*, 66 Ohio St.3d 280, 612 N.E.2d 305 (1993). On appeal, the defendant argued that the admission of the alleged victim's out-of-court

statements violated his confrontation rights under the Ohio and United States Constitutions. *Id.* at syllabus. Describing Article I, Section 10 as "more detailed in the rights it sets forth" than the Sixth Amendment, the Supreme Court explained that "[f]or many years, the rights to confrontation set forth in the respective Constitutions were construed as being the same, in part because the right to confrontation in the Sixth Amendment was considered by the United States Supreme Court to require face-to-face confrontation in most circumstances." *Id.* at 288. But the court noted that, "[i]n the last thirteen years, the United States Supreme Court has drifted away from that requirement." *Id.* Moreover, while " 'the admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation' under the Sixth Amendment as that federal right is defined by the United States Supreme Court * * * the admission may violate our state constitutional right of confrontation." *Id.* at 291.[1] The court, thus, "construe[d] the right to confrontation contained in Section 10, Article I to require live testimony where reasonably possible." *Id.* at 293. Although victims of child abuse are not always obligated to provide testimony, the court held that the Ohio Constitution required the trial court "to bring the child to court or to bring the court to the child to gain an unbiased view of whether the child was capable of testifying" rather than "rel[ying] upon the testimony [from a third person] who indicated that * * * the child would not be able to express herself in a courtroom." *Id.* at 293-294.

{¶43} Although in many respects *Storch* simply retraced our steps back to the historical understanding of Ohio's confrontation right, it did not receive a warm

---

[1] The "firmly rooted hearsay exception" language comes from *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which was abrogated by *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

embrace from Ohio courts (perhaps owing to the context of the case), which found various ways to distinguish or disregard it. *See State v. Johnson*, 4th Dist. Ross No. 94 CA 2004, 1995 WL 764319, *8-9 (Dec. 26, 1995) (labeling "face to face" analysis dicta); *State v. Edinger*, 10th Dist. Franklin No. 05AP-31, 2006-Ohio-1527, ¶ 83 (limiting *Storch* to Evid.R. 807 cases); *State v. Brown*, 5th Dist. Stark No. CA-9543, 1994 WL 477888, *2 (Aug. 22, 1994) (same).

{¶44} The Supreme Court appeared to lend credence to these complaints when, in the footnote of a 2007 opinion involving a confrontation issue, it suggested that *Storch* may be confined to Evid.R. 807 cases. *See State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, fn. 5 ("Our analysis is not altered by the court's decision in *State v. Storch* * * * which addressed the constitutionality of Evid.R. 807 under the federal and Ohio Constitutions."). And then in 2010, the Supreme Court circled back to *Self*: " 'Section 10, Article I of the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment.' " *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12, quoting *Self*, 56 Ohio St.3d at 79, 564 N.E.2d 446. But *Arnold* made no mention of *Storch*—and provided no analysis of the language of Article I, Section 10—leaving courts and litigants to grapple with *Storch*'s validity in the subsequent years. *See, e.g., Matter of S.M.B.*, 10th Dist. Franklin No. 17AP-899, 2019-Ohio-3578, ¶ 94, 109 (Nelson, J., concurring in part and dissenting in part) (describing Ohio's confrontation jurisprudence as "notoriously murky," but concluding that "it seems likely * * * that *Storch* no longer provides authority for the proposition that Ohio's Constitution ensures greater confrontation clause rights than does the federal constitution."); *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 41-42 (7th Dist.) (rejecting claim that Ohio's

confrontation right is more robust than the federal confrontation right, suggesting that *Arnold* abrogated *Storch*).

II.

{¶45}  While Ohio's confrontation jurisprudence is especially "murky," it is not the only state with a "face to face" confrontation clause.  The Indiana Supreme Court enforced the state's "face to face" confrontation clause in *Brady v. State*, 575 N.E.2d 981, 987 (Ind.1991).  There the court recognized that "the federal right of confrontation and the state right to a face-to-face meeting are co-extensive" but nevertheless "[t]he language employed in the two provisions is different[.]"  *Id.*  The court explained that "[t]he words 'face to face' as used in the passage is an adverbial phrase modifying 'to meet,' and thus describes how a criminal defendant in this state and the State's witnesses are to meet.  'Hand in hand' and 'back to back' are similar modifiers.  The separate definition given it in most dictionaries shows its persistent and common usage."  *Id.*  Characterizing the common understanding of "face to face" as "primary, unmistakable, and dominant" the court held that "face to face" means the "persons are positioned in the presence of one another so as to permit each to see and recognize the other."  *Id.*  Therefore, "[w]hile the language employed in [Indiana's confrontation clause] has much the same meaning and history as that employed in the Sixth Amendment, it has a special concreteness and is more detailed."  *Id.*

{¶46}  The Illinois Constitution once included a "face to face" confrontation requirement, but the Illinois legislature amended this language to mirror the Sixth Amendment after *People v. Fitzpatrick*, 158 Ill.2d 360, 365, 633 N.E.2d 685 (1994).  There the Illinois Supreme Court held that "the confrontation clause of the Illinois Constitution provides that a defendant is entitled to a face-to-face confrontation with

a witness. * * * The language in the Illinois Constitution confers an express and unqualified right to a face-to-face confrontation with witnesses." *Id.* Hence, the court held that "closed circuit television does not provide the defendant with the face-to-face encounter envisioned by the drafters of the Illinois Constitution." *Id.* Several months later, the Illinois General Assembly proposed, and the voters passed, an amendment to Illinois's confrontation clause that replaced "to meet the witnesses face to face" with "to be confronted with the witnesses against him or her." The Illinois Supreme Court recognized that "[t]he legislative debates surrounding the proposed constitutional amendment indicate that the amendment was intended to reverse the effects of the *Fitzpatrick* decision and to change the language of the confrontation clause in the Illinois Constitution to conform with the language of the confrontation clause in the United States Constitution." *People v. Dean*, 175 Ill.2d 244, 254, 677 N.E.2d 947 (1997).

{¶47} Pennsylvania's "face to face" confrontation requirement met a similar fate. The Pennsylvania Supreme Court once held that, unlike the federal confrontation clause, Pennsylvania's "face to face" confrontation clause "does not reflect a 'preference' but clearly, emphatically and unambiguously requires a 'face to face' confrontation." *Commonwealth v. Ludwig*, 527 Pa. 472, 478, 594 A.2d 281 (1991). That court was "cognizant" of the public interest in protecting witnesses, particularly in child abuse cases, but nevertheless held that this "interest cannot be preeminent over the accused's constitutional right to confront the witnesses against him face to face." *Id.* at 480. In 2003, however, Pennsylvania amended its confrontation clause to mirror the federal confrontation clause, thus abrogating *Ludwig*. *See Commonwealth v. Tighe*, 224 A.3d 1268, 1279 (Pa.2020) (" 'By removing the "face-to-face" language from the Pennsylvania Constitution and

making the confrontation clauses of the Pennsylvania Constitution and the Sixth Amendment identical, the amendment was designed to permit the enactment of laws or the adoption of rules that would permit child victims or witnesses to testify in criminal proceedings outside the physical presence of the accused.' "), quoting *Commonwealth v. Williams*, 624 Pa. 183, 84 A.3d 680 (2014), fn. 2.

{¶48} The interpretation of "face to face" that prevailed in the courts above is certainly not unanimous. Some states have simply construed their "face to face" confrontation clauses to conform to the Sixth Amendment confrontation right, stripping that language of any independent significance. The State of Washington treats its "face to face" confrontation clause as identical to the federal confrontation clause. *State v. Foster*, 135 Wash.2d 441, 459, 957 P.2d 712 (1998) ("Although the language of the Sixth Amendment and this state's confrontation clause is not word-for-word identical, the meaning of the words used in the parallel clauses is substantially the same. * * * We find no significant difference between the language used in the parallel provisions of the state and federal confrontation clauses."). The Kansas Supreme Court follows a similar approach. *State v. Busse*, 231 Kan. 108, 111, 642 P.2d 972 (1982) ("[T]he right of confrontation under the United States Constitution and the right to meet the witnesses 'face to face' under Section 10 of the Kansas Bill of Rights are satisfied when defendant has had an opportunity to cross-examine the witnesses against him. * * * 'Under both the federal and state constitutions a defendant charged with crime is entitled to be confronted with the witnesses against him.' "), quoting *State v. Terry*, 202 Kan. 599, 599, 451 P.2d 211 (1969). And the Kentucky Supreme Court has made clear that the "face to face" language in its constitution is insignificant. *See v. Commonwealth*, 746 S.W.2d 401, 402 (Ky.1988) ("The right to confront one's accusers in a criminal trial is a right

guaranteed by the 6th Amendment to the United States Constitution and also by Section 11 of the Kentucky Constitution. The United States Constitution grants the accused the right 'to be confronted with the witnesses against him.' The Kentucky Constitution grants the accused the right 'to meet the witnesses face to face.' The difference in language is not significant and both amendments are simply designed to require that a defendant in a criminal case is entitled to a confrontation with his accusers.").

III.

{¶49} This backdrop illustrates the importance of the debate and why we, as a state, should take a closer look at this question. In many respects, however, the question framed is more general: are we going to abdicate our constitutional interpretation to Washington, or will we recognize and enforce different language and rights in our own Constitution?

{¶50} Ohio courts, particularly the Supreme Court, "can and will interpret our Constitution to afford greater rights to our citizens when [they] believe that such an interpretation is both prudent and not inconsistent with the intent of the framers." *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 21, citing Jeffery Sutton, *What Does—and Does Not—Ail State Constitutional Law,* 59 U.Kan.L.Rev. 687, 707 (2011) ("There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized guarantee, such as prohibition on 'unreasonable' searches, would have just one meaning for a range of differently situated sovereigns."). While courts "can and should borrow from well-reasoned and persuasive precedent from other states and the federal courts, * * * in so doing [they] cannot be compelled to

parrot those interpretations." *Id.* at ¶ 22. *See, e.g.*, *Sherman v. Ohio Pub. Emps. Retirement Sys.*, 163 Ohio St.3d 258, 2020-Ohio-4960, 169 N.E.3d 602, ¶ 37 (Fisher, J., concurring) ("Among those points is my concern that we avoid any upward delegation of our authority and duty to interpret the Ohio Constitution, placing us in a position in which we might blindly accept any further developments in federal law.").

{¶51} Hitching our sail to the federal constitutional interpretation creates numerous problems. When the United States Supreme Court's interpretation aligns with how Ohio views its Constitution, I suppose no damage is done, but when it departs, it often leaves courts floundering and trying to adjust the analysis and methodology on the fly (as attempted in *Storch*). There is a better way—let's just interpret our state constitution as it stands independently and then we don't have to scramble if SCOTUS goes awry. This makes even more sense given the textual differences between our confrontation clause and the Sixth Amendment. We have a different confrontation clause, written in a different time with a different backdrop, and invoking different language—let's embrace those distinctions and give our Constitution its due.

{¶52} And this is not simply an academic debate that might generate pages of law review articles. Zoom and related technology have pressed this issue to the forefront. As we all have become somewhat accustomed to meeting with others by Zoom, and even to appearing in court via Zoom, this certainly sparks confrontation clause concerns in criminal trials. Courts around the country have begun to grapple with this. *See, e.g.*, *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573, ¶ 24-25 (8th Dist.) (an available witness could not testify through videoconference, but an unavailable witness could testify through videoconference despite video stream

interruptions experienced during the testimony); *State v. Bailey*, 404 Mont. 384, 2021 MT 157, 489 P.3d 889, ¶ 49 (the trial court erred by allowing the prosecution's expert witness to testify via videoconference without a showing that remote testimony was necessary to further an important public policy).

{¶53} I certainly understand the impulse to bend or twist our constitutional language in such a way as to render it Zoom-compatible. But if we do that, we might as well admit that the clause "face to face"—inserted twice at two different times in our constitutional history—really has no meaning. And if we scrub out that clause, what's to stop us from going further?

{¶54} Our constitutional heritage points in a different direction, urging us to "secure" the confrontation right "against the power of change or innovation." *Summons,* 5 Ohio St. at 340. I would urge the Supreme Court to consider this issue anew (at some point in the near future), and provide guidance to clarify the existing confusion in the caselaw. In so doing, we should no longer reflexively follow federal guidance. Instead, we should honor the distinct language in our Constitution and the purpose of it, as reinforced by our precedent from an earlier age.

{¶55} This case is ultimately an easy one because, regardless of what standard one might apply, we can't permit a witness situated a stone's throw from the courthouse not to appear in person simply because he hadn't showered and shaved. If we sanction that, then we essentially obliterate the confrontation right, or at least we open the door to its demise. We can accordingly leave any debate over the proper confrontation standard in Ohio for another day, with a case presenting a much closer question.

{¶56} Therefore, I respectfully concur with majority opinion because I believe any violation of Mr. Banks's confrontation right here would constitute

harmless error on the record at hand. In light of this conclusion, this case may offer a poor vehicle for Supreme Court review of this point, but we certainly need guidance on these matters as the practice of law and the administration of the courts continue to evolve in response to the pandemic and to technological innovation.

Please note:

    The court has recorded its own entry this date.