[Cite as *State v. McCloud*, 2024-Ohio-2190.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230493 |
| | | TRIAL NO. B-2204750 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| JEREMIAH MCCLOUD, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: June 7, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

Zayas, **Judge.**

{¶1}  Jeremiah McCloud appeals his convictions, after a jury trial, for aggravated robbery, one count of attempted murder, and two counts of felonious assault, all with gun specifications.  In four assignments of error, McCloud contends that the trial court erred by allowing the admission of hearsay evidence, his conviction for aggravated robbery is not supported by sufficient evidence and is contrary to the manifest weight of the evidence, and his conviction for attempted murder is against the manifest weight of the evidence.  For the following reasons, we overrule the assignments of error and affirm the judgment of the trial court.

## Factual Background

{¶2}  On October 6, 2022, Jeremiah McCloud was indicted for shooting Kevin Morrison in a Colerain Township park.  He pleaded not guilty and proceeded to a jury trial.

{¶3}  Officer John McMahon, a patrol officer for the Colerain Township Police Department, testified that he had met a few other officers at the Speedway gas station on Colerain Avenue to purchase water and chat about an earlier call for service. The officers noticed a red Chevrolet sedan parked across three parking spaces, and while looking at the car, they received a dispatch that a person at the Speedway address had been shot.  McMahon entered the store and started rendering aid.  The shooting victim, Morrison, said he had been shot at a park by McCloud.

{¶4}  Morrison testified that McCloud's cousin was a good friend of his, and he was acquainted with McCloud.  They had spoken a few times and played basketball together.  For months, they had discussed Morrison purchasing a gun from McCloud. They communicated by Snapchat and text messages.  One night, while Morrison was playing a video game, he received a text from McCloud offering to sell him a gun.

Morrison drove to an apartment complex in Fairfield to pick up McCloud and waited for McCloud for about an hour and a half. When McCloud finally walked out of the apartment, he got into the front passenger's seat and showed him the small black handgun. McCloud told him that he needed $300 cash for the gun, so Morrison stopped at an ATM to get the money. McCloud suggested that they go to a park to test fire the gun.

{¶5} They arrived at the park a little after midnight. McCloud loaded the gun, and both of them put on Latex gloves. Morrison had worked for Terminix, and the gloves were in his trunk because they were part of his uniform. They walked to a baseball field, and Morrison had a "funny feeling" because McCloud was really nervous and acting suspicious. Morrison walked behind McCloud and kept his cell phone flashlight pointed at McCloud. Morrison testified that he held the phone in his hand the entire time except for the brief period when he fired the gun. McCloud fired the gun two or three times, Morrison shot it once or twice, then McCloud asked for the gun. McCloud took the magazine from the gun and dropped a few bullets on the ground. When McCloud asked him to pick up the bullets, Morrison said no and became suspicious because McCloud kept looking around and pointing the gun at the ground. McCloud picked up the bullets, turned around, and started shooting.

{¶6} Morrison was shot in the left wrist, the stomach, and his chest. After the first shot, Morrison started swinging at McCloud, but he fell to the ground after getting shot in the chest. As Morrison was trying to stand, McCloud pointed the gun at his head and said, "I'm going to pop you." He heard the gun click, but it didn't fire. Morrison started running and hid in some bushes. After five or ten minutes, Morrison walked to his car and drove to the Speedway. Morrison's cell phone, which had his

driver's license in the case, and the cash were missing. He did not know if he dropped them or if McCloud took them. After McCloud started shooting at him, Morrison dropped the phone.

**{¶7}** When he arrived at the Speedway, Morrison asked the cashier to call 911, grabbed water, and sat on the floor. Morrison had lost one of his orange Crocs. Morrison vaguely remembered speaking to a police officer and telling him that, "It was Jeremiah McCloud." Morrison was taken to University of Cincinnati Medical Center. He was in the hospital for two-and-a-half weeks and had multiple surgeries. Morrison spoke with Detective Shea when he first woke up, but he could not remember what they discussed due to the medications he had been given. Shea attempted to locate his iPhone, but the phone had either been turned off or the battery was dead.

**{¶8}** On cross-examination, Morrison was asked if he told the police during his initial interview that McCloud pointed the gun at his head and pulled the trigger, and the following questioning occurred:

Morrison: I'm not even going to lie. I can't say what I said. Everything I said in the hospital, I was on medication. I just woke up. You know, I don't really remember everything I told. I know I talked to Det. Shea. I told him a lot.

Defense Counsel: But it's your thought now that that's what happened?

Morrison: It's my thought?

Defense Counsel: It's your testimony that that's what happened?

Morrison: Yes sir.

{¶9}   Morrison agreed that he may have given his phone to McCloud to hold while he test fired the gun, but he could not remember.  His cell phone flashlight was the only light source they had in the park.

{¶10}   Detective Chris Cullman, an investigator for Colerain Township police, responded to the initial call for assistance at Speedway with Detective Carusone.  By the time he arrived, Morrison had been transported to the hospital.  Morrison did not know the name of the park where he was shot, and the police determined it was Heritage Park in Colerain Township.  The following day, Cullman processed the crime scene at the park.

{¶11}   Cullman photographed and collected a spent shell casing and a spent projectile.  He also recovered Morrison's missing orange Croc in the park's dumpster.  A park employee had found the shoe in the grass by the ball fields and put it in the dumpster.  The other Croc was found at the Speedway.  Cullman also participated in the search of McCloud's residence.  A small black gun was found in a cabinet above the refrigerator, and four cell phones, a live round, and shell casings were collected.  The ballistic evidence was sent to the Hamilton County Coroner's Lab for testing.

{¶12}   Colerain Township patrol officer Patrick Hoard drove McCloud to the police department for an interview and then to the Justice Center.  While McCloud was being processed at the jail, Hoard was required to wait for the deputies to finish searching and processing McCloud.  The deputies found Morrison's identification in McCloud's wallet and gave it to Hoard.

{¶13}   Forensic scientist Bridget Chambers from the Hamilton County Coroner's Office testified that she works in the Firearm and Toolmark Identification Unit.  Her primary duty is to determine whether a bullet or cartridge case was fired

from a specific firearm. The cartridge case and bullet found in the park had been fired from the firearm located in McCloud's apartment. A second casing also matched the gun.

{¶14} Detective Sam Shea responded to University of Cincinnati Medical Center to interview Morrison. When he arrived, Morrison was in surgery. The following day, Shea was able to speak with him. Morrison told him that he went to an ATM in College Hill to withdraw cash to buy the gun. Shea obtained the video of the ATM transaction from First Financial Bank. Over objection, Shea testified that during the initial interview, Morrison told him that McCloud put the gun to his head and fired.

{¶15} Shea obtained a search warrant for Morrison's car. A spent shell casing was found in the coin compartment of the front passenger door. Shea submitted the casing to the lab, and it matched McCloud's gun.

{¶16} After obtaining Morrison's phone number, Shea attempted to locate the iPhone. Shea received pings from AT&T every 15 minutes that included GPS coordinates. Shea plugged the coordinates into Google maps, and the iPhone was in the area of Camelot Drive. Shea interviewed McCloud at the police station and learned that McCloud lived on Camelot Drive. The state rested after Shea's testimony.

{¶17} Jeremiah McCloud testified that he knew Morrison through a close friend. Morrison and he had discussed a gun sale for at least a month. Morrison had texted that evening asking to buy a gun. McCloud left his home around 11 p.m. He had been cleaning his house while Morrison waited for him. They drove to a bank in College Hill that McCloud had been to on a prior occasion. They agreed to a purchase price of $300. Morrison asked to test fire the gun and typed in a location on his phone. They drove to Heritage Park, and McCloud loaded the gun. Morrison retrieved gloves

6

from his trunk and offered a pair to McCloud, but he declined. McCloud thought it was weird that Morrison put on gloves because Morrison had handled the gun when McCloud gave it to him while in the car.

{¶18} McCloud fired the gun twice and gave it to Morrison. Morrison gave McCloud his phone and asked him to record the test fire. McCloud refused to record the test fire and put the phone in his pocket. After Morrison shot the gun, he placed the gun on the ground. McCloud picked it up the gun and began walking toward the car. While walking, he heard footsteps approaching him and a wind around his neck like Morrison was swinging toward him. McCloud thought Morrison was trying to do something to him or trying to get the gun. McCloud became scared and nervous, so he turned around and fired three shots. Then he ran from the park and walked home. McCloud's cell phone was dead, so he could not call anyone. McCloud testified that he fired the gun in self-defense.

{¶19} On cross-examination, McCloud testified that he had originally found the gun on the side of a playground in his old neighborhood. When he test fired the gun, it jammed. When he released the clip, he saw that it was dirty, so he washed the bullets and the gun was no longer jammed.

{¶20} After McCloud left the park, it took him an hour to get home, but he could not remember the route he took or the names of the streets he traversed. When he was almost home, he realized he had Morrison's phone in his pocket. McCloud searched the phone case, took the ID, and left the phone outside on Camelot. He planned to show the ID to identify the person who tried to rob him. McCloud did not tell the police he had the ID because he wanted to consult with a lawyer.

{¶21} McCloud testified that when he fired, the second punch was in motion, and he feared for his life. He did not know if Morrison had a knife or other weapon. When asked about the spent casing in the passenger door, McCloud stated that he did not put in there, and someone else must have put it there. When McCloud arrived home, he went to sleep. It did not occur to him call an ambulance, and he did not want to contact the police. After McCloud's testimony, the defense rested.

{¶22} The jury found him guilty of all of the charges, and the court sentenced McCloud to an aggregate term of 15-18 years in prison.

### Inadmissible Hearsay

{¶23} In his first assignment of error, McCloud contends that the trial court erred by allowing hearsay evidence that bolstered the testimony of the sole witness on the attempted-murder charge.

{¶24} Morrison testified that he could not remember if he told Shea that McCloud put the gun to his head and pulled the trigger during his initial interview at the hospital because of the medication he was taking. During Shea's testimony, the prosecutor asked him if Morrison told him that McCloud had put the gun to his head. McCloud objected arguing that any response would be inadmissible hearsay designed to bolster Morrison's credibility.

{¶25} McCloud contends that the court erred by allowing Shea to testify that Morrison told him, during his initial interview, that McCloud attempted to shoot him in his head. McCloud further argues that the testimony was prejudicial because it bolstered Morrison's credibility. In response, the state argues that the statement was admissible as a prior consistent statement under Evid.R. 801(D)(1)(b).

{¶26} The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of

an abuse of discretion that has created material prejudice. *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).

{¶27} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "Under the hearsay rules, the prior consistent statement of a testifying witness is not admissible to directly bolster that witness's credibility." *State v. Trusty*, 1st Dist. Hamilton Nos. C-120378 and C-120386, 2013-Ohio-3548, ¶ 47. However, under Evid.R. 801(D)(1)(b), "[a] statement is not hearsay if * * * [t]he declarant testifies at trial * * * and is subject to cross-examination concerning the statement and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive[.]"

{¶28} Ordinarily, Evid.R. 801(D)(1)(b) allows the state to introduce prior out-of-court consistent statements to rebut the charge of "recent fabrication" raised by defense counsel during the cross-examination of a state's witness, if the witness has been sufficiently impeached. *State v. Strutz*, 1st Dist Hamilton Nos. C-100334 and C-100335, 2011-Ohio-3660, ¶ 12. "In determining whether to admit a prior consistent statement, a trial court should take a 'generous view' of the 'the entire trial setting to determine if there was sufficient impeachment to amount to a charge of fabrication or improper influence or motivation.'" *Id.*, citing *State v. Grays*, 12th Dist. Madison No. CA2001-02-007, 2001-Ohio-8679.

{¶29} Here, Morrison did not remember what he told the investigator at the initial interview. "The mere failure of [a witness] to remember the events surrounding an interview with police or hospital personnel, without anything further, does not rise

9

to the level of implied fabrication." *State v. English*, 12th Dist. Butler No. CA2013-03-048, 2014-Ohio-441, ¶ 45. Thus, defense counsel did not sufficiently impeach Morrison to attack his credibility. McCloud did not argue in opening or closing statements that Morrison fabricated his testimony regarding the gun being pointed at his head and fired. Additionally, Morrison did not affirm or deny telling Shea about the gun to his head. Thus, Shea's statement that Morrison told him the gun was pointed at his head cannot be considered consistent with Morrison's inability to recall what he told the officer.

{¶30} The erroneous admission of hearsay statements does not require reversal if the error was harmless. "A reviewing court may overlook an error where the remaining admissible evidence, standing alone, constitutes 'overwhelming' proof of a defendant's guilt." (Citations omitted.) *State v. Banks*, 1st Dist. Hamilton Nos. C-200395 and C-200396, 2021-Ohio-4330, ¶ 26.

{¶31} McCloud argues that the sole evidence to support that he had the purpose to murder Morrison was the testimony that he pointed the gun at Morrison's head and said he was going to "pop him real quick." Therefore, he was prejudiced by Shea's testimony because it bolstered Morrison's credibility.

{¶32} Here, the error was harmless because Morrison testified that McCloud shot him in the chest, stomach, and wrist and pointed the gun to his head and pulled the trigger. McCloud's intent to murder Morrison was established by the fact that McCloud fired multiple close-range shots at Morrison, hitting him in the chest, stomach, and wrist.

{¶33} We overrule the first assignment of error.

### Sufficiency and Manifest Weight

**{¶34}** In his second and third assignments of error, addressed together, McCloud contends that the conviction for aggravated robbery was not supported by sufficient evidence and is contrary to the manifest weight of the evidence.

**{¶35}** In reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶36}** As to the weight of the evidence, we review whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). We consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *Thompkins* at 387. We afford substantial deference to credibility determinations because the factfinder sees and hears the witnesses. *See State v. Glover*, 1st Dist. Hamilton No. C-180572, 2019-Ohio-5211, ¶ 30.

**{¶37}** McCloud was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides:

> (A) No person, in attempting or committing a theft offense, as defined
> in section 2913.01 of the Revised Code, or in fleeing immediately after
> the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the

offender's control and either display the weapon, brandish it, indicate

that the offender possesses it, or use it[.]

A person commits a theft offense when he knowingly obtains or exerts control over another's property without the owner's consent. R.C. 2913.02.

**{¶38}** McCloud argues that the state failed to produce evidence that he had the purpose to commit a theft offense because Morrison admitted that he may have given his iPhone to McCloud to hold while he fired the gun. McCloud misstates Morrison's testimony. Morrison testified he had his phone in his hand the entire time except when he test fired the gun. After he fired the gun, he again had his phone in his hand and dropped it after he was shot. McCloud admitted that he had the phone and left it outside his home after taking Morrison's ID.

**{¶39}** Viewing the evidence in the light most favorable to the state, the state presented sufficient evidence to establish that McCloud obtained Morrison's phone and ID without his consent. Although McCloud testified that he put the phone in his pocket after Morrison asked him to hold it and forgot it, the jury believed Morrison's testimony, and we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

**{¶40}** Accordingly, we overrule the second and third assignments of error.

### Manifest Weight

**{¶41}** In his fourth assignment of error, McCloud argues that the attempted-murder conviction was against the manifest weight of the evidence because Morrison's testimony was "bizarre" and not as credible as McCloud's "simple and direct" testimony.

**{¶42}** "[I]t is well settled law that matters as to the credibility of witnesses are for the trier of fact to resolve." *State v. Brooks*, 1st Dist. Hamilton No. C-220102, 2023-Ohio-846, ¶ 23, quoting *State v. Ham*, 1st Dist. Hamilton No. C-170043, 2017-Ohio-9189, ¶ 21. "When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." (Citations omitted.) *Id.* Given the evidence presented at trial, the jury was entitled to reject McCloud's version of events and find Morrison's testimony to be more credible. We cannot say that the jury lost its way or created a manifest miscarriage of justice in finding McCloud guilty.

**{¶43}** We overrule the fourth assignment of error.

## Conclusion

**{¶44}** Having overruled McCloud's four assignments of error, we affirm the trial court's judgment.

Judgment affirmed.

**BOCK, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry this date.