[Cite as *State v. Olman*, 2022-Ohio-2647.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

CHARLES OLMAN,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 BE 0034**

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 21 CR 109

**BEFORE:**
Carol Ann Robb, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Daniel P. Fry,* Assistant Prosecuting Attorney, 52160 National Road, St. Clairsville, Ohio 43950 for Plaintiff-Appellee and

*Atty. Brian A. Smith*, 123 South Miller Road, Suite 250, Fairlawn, Ohio 44333 for Defendant-Appellant.

Dated:  June 30, 2022

---

**Robb, J.**

{¶1}  Appellant, Charles Olman, was convicted of two counts of rape, first-degree felonies, after a jury trial.  He was sentenced to two consecutive life sentences without the possibility of parole and classified as a Tier III sex offender.  He raises eight assignments of error on appeal.  For the following reasons, each of Appellant's arguments lacks merit, and the trial court's decision is affirmed.

Statement of the Case

{¶2}  Appellant was indicted by the grand jury in May of 2021 and charged with two counts of rape of a minor less than ten years old in violation of R.C. 2907.02(A)(1)(b) and R.C. 2907.02(B).  The indictment alleged that the offenses occurred on or between January 1, 2018 and October 31, 2020.

{¶3}  The parties exchanged discovery, and in July 2021 the state filed a notice of intent to use other acts evidence under Evid.R. 404(B).  Defense counsel opposed and moved to exclude this evidence via a July 2021 motion in limine, which was overruled.

{¶4}  The case proceeded to jury trial on July 27, 2021.  The state introduced the testimony of eight witnesses, which revealed the following.

{¶5}  In September of 2020, Belmont County Children Services learned about a neglect allegation involving a mother and her two young children.  Appellant initially contacted the agency complaining that the mother of his child was abusing drugs and not caring for her children.  Appellant and the woman had been in a romantic relationship, lived together for some time with the two young children, but were not married.  Appellant is the father of the victim's younger brother, but he is not the victim's biological father. The couple had separated and were no longer living together at the time.

{¶6}  The agency caseworker, Jessica Hartley, interviewed the mother and her two children.  Hartley did not observe any evidence of neglect or drug abuse during this first interview, but both children indicated there was physical abuse between their mother and Appellant, and their mother raised concerns about possible sexual abuse.

**{¶7}** Thereafter, Hartley scheduled the recorded interview of the older of the two young children, a six-year-old girl named T.F.  Her interview took place at a local child advocacy center, referred to as Harmony House, in October of 2020.  T.F. verified that she was six years old at the time and in kindergarten.  This Harmony House interview did not reveal any sexual abuse allegations, and centered on domestic violence allegations. (State's Ex. 2.)

**{¶8}** Approximately 20 days later, T.F.'s mother contacted the agency indicating that T.F. had since made allegations of sexual abuse involving Appellant.  Appellant did not live with them at the time.

**{¶9}** The minor was again interviewed at Harmony House in November of 2020, and this time she told the interviewer, Robert Scott Steele, that her mom's boyfriend, whom she referred to as "daddy Chuck," had sexually abused her.  Both of her Harmony House interviews were recorded, and the videos were played at trial.  (State's Ex. 4.)

**{¶10}** At the beginning of her second interview, T.F. spontaneously states that she is going to draw about herself and "what daddy did."  She confirms that the dad she is referring to is daddy Chuck.  She said:  "He was trying to marry me."  "I said no, but he still did it."  She described that their pants were down, and he was behind her.  She said, "when mommy comes, we pulled our pants up."  "Daddy" told her to pull her pants and underwear down.  After that, she demonstrated how he spit on his genitals, gesturing to her front genitals, and then said he put his "butthole" on my "hoo hoo."  (State's Ex. 4.)

**{¶11}** She said her baby brother was there at the time, but he had a blanket or sheet over his head.  T.F. said that "daddy" "married her" more than one time.  They were laying down at their old house on Chuck and her mother's bed.  She described it stating, "he spitted on his front butthole.  He married me on my butt too."  She circled the penis on the anatomically correct drawing of an adult male, and said he touched her with it when her pants and her underwear were down.  She said it "hurt really bad."  She also said, "he thinks I'm his girlfriend," and that it felt wet and "like Kool-Aid."  T.F. told the interviewer that her "daddy" told her not to tell because the "CPS lady would take her."  (State's Ex. 4.)

**{¶12}** The Harmony House forensic interviewer Steele testified that T.F. was six years old when he interviewed her.  (Tr. 360.)  Steele explained that T.F. called a penis

a "butthole" and her vagina a "hoo-hoo" or "hoo-haw." Steele also detailed that T.F. told him and showed him how Appellant would spit on his hand and put it on his penis before putting it in her rectum or vagina. (Tr. 350-373.)

{¶13} Steele testified that T.F. identified Appellant by name several times during the interview and that she said he "married her in the front and the back," which she also demonstrated with the drawings. (Tr. 370.) Steele explained on cross-examination that when T.F. said "it hurt really bad," Steele believed she was talking about when Appellant inserted his penis in her vagina. (Tr. 374.)

{¶14} In December of 2020, T.F. was examined by Leslie Doerfler, a specialist dealing with minor sex abuse victims. The exam revealed no physical signs of sexual abuse or rape. Doerfler testified that T.F. was born in October of 2013 and was seven years old at the time of the exam. Doerfler stated that sexual abuse examinations of minors are best when conducted within 72 hours after the alleged abuse and before healing occurs. (Tr. 398.) After this window of time, she said it is common not to see any vaginal injury. Doerfler also testified that it is a myth that sex will always result in damage to a female's hymen, explaining that hymens heal very quickly. (Tr. 432.)

{¶15} Dr. Robin Teoli, T.F.'s counselor with a mental health facility, also testified. She confirmed that T.F. was seven years old as of the trial date. During one of her sessions, T.F. told Teoli that Appellant pulled down her pants and "married her." (Tr. 505.) She also explained how T.F. demonstrated how Appellant would spit on his fingers and rub it on his privates before "marrying her." She also recounted T.F. explaining how he put his penis in T.F.'s mouth, which she said "tastes nasty." T.F. revealed more details about the abuse allegations with almost every appointment, and she did not retract her statements, but elaborated on the encounters. Teoli also said that T.F. told her that Appellant did it ten times in her "hoo-hoo," ten times in her mouth, and 13 times in her "butt." (Tr. 539.) Teoli remembers T.F. stating that he hurt her, but he promised her cake if she did not tell. He also threatened to spank her if she did tell. (Tr. 555-556.)

{¶16} T.F. testified during trial via live videoconference. She said "daddy" put his privates in her mouth, "butt", and her "hoo hah" "like ten times" with his pants down. She said it was inside of her and "hurt a lot." She also described Appellant putting his fingers

to his mouth and putting spit on his "butthole," meaning his penis, before putting it in her. (Tr. 559-563.)

{¶17} During her testimony, T.F. heard someone cough in the courtroom, which prompted her to ask to see Appellant so she could show him her "mad face." She then identified him as "daddy Chuck" and began crying. (Tr. 569-570.)

{¶18} Two state's witnesses testified under objection that they had been sexually abused by Appellant when they were children. The trial court allowed their testimony as permissible other acts evidence under Evid.R. 404(B). Both recalled Appellant spitting on his hand or fingers and putting it on his penis before assaulting or raping them. The jury was instructed not to consider their testimony to prove Appellant's character but to show that he acted in conformity with his past conduct. (Tr. 583 and 688.)

{¶19} The defense called two witnesses, both worked with T.F. as therapists or counselors at her school. Tammy Becker worked with T.F. as a school therapist individually and in a group setting. Becker confirmed that she recorded in one of her notes that T.F. was in a good mood on September 25, 2020 because her mom got her a new phone and gave her a candy bar. Another of Becker's notes indicates that T.F. said her "dad is Chris" in December of 2021. (Tr. 641.)

{¶20} Beverly Piatt was also called by the defense. Piatt is a mental health technician who also worked with T.F. at her school. Piatt confirmed via her notes that T.F. had referred to someone named Chris as her dad on November 2, 2020 and that T.F. said: "He's my daddy now." (Tr. 653.)

{¶21} During her first recorded interview, T.F. stated in part that "Chris is my dad now." Chris lived with her at the time of the first interview because her "other daddy" was in jail. (State's Ex. 2.) Further, T.F.'s caseworker Hartley agreed on cross-examination that T.F. had made allegations about other people in April of 2021. T.F. indicated that other people would "marry her" too. During Hartley's testimony, she explained that T.F.'s mother's ex-husband is named Chris, who is referred to as "big Chris," and he has a son also named Chris or "little Chris." (Tr. 289.)

{¶22} No further details about these allegations were revealed during trial. No one testified that it was this individual referred to as "daddy Chris" or Chris who committed these offenses against T.F., and not Appellant.

Case No. 21 BE 0034

**{¶23}** On July 30, 2021, the jury found Appellant guilty of both counts of rape and specifically found via interrogatory that the victim was less than ten years old at the time of both offenses. Appellant was later sentenced to two consecutive life sentences without the possibility of parole and classified as a Tier III sex offender. He timely appealed and raises eight assignments of error.

<u>First Assignment of Error: Manifest Weight of the Evidence</u>

**{¶24}** Appellant's first assignment of error contends:

"Whether the jury lost its way and created a manifest miscarriage of justice in convicting Appellant, when the State did not present any conclusive physical evidence in support, where the evidence showed that T.F. had been coached or influenced to make the allegations against Appellant, and where other evidence in the record showed that T.F. was not a credible witness, such as T.F.'s statements regarding sexual acts between T.F. and her brother, and from other individuals."

**{¶25}** A manifest weight review requires us to review the evidence and to determine whether this is an exceptional case in which it is patently apparent that the jury lost its way. *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541 (1997). The reversal of a jury's verdict on manifest weight grounds requires a unanimous concurrence of all three judges. *Id.*

> The * * * weight of the evidence addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? * * * [A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.' * * *.

*State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

**{¶26}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "A jury is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis,* 8th Dist. Cuyahoga No.

98538, 2013-Ohio-1184, ¶ 18, citing *Iler v. Wright,* 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25.

**{¶27}** Appellant was convicted of two counts of rape in violation of R.C. 2907.02(A)(1)(b):

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> As relevant here,
>
> '[s]exual conduct' means vaginal intercourse between a male and female; anal intercourse * * *; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

**{¶28}** Appellant argues the jury lost its way for several reasons. First, he claims the lack of physical injuries invalidates T.F.'s allegations, requiring reversal.

**{¶29}** R.C. 2907.01(A) does not require physical corroborating medical evidence. *State v. Hanni,* 8th Dist. Cuyahoga No. 91014, 2009-Ohio-139, ¶ 22. Rape convictions may be accomplished via the victim's testimony alone. *State v. Rasul,* 8th Dist. Cuyahoga No. 101625, 2016-Ohio-200, ¶ 8. A rape conviction does not require objective physical evidence of injury showing the sexual conduct occurred. *See In re Hollobaugh,* 7th Dist. Mahoning No. 08 MA 22, 2009-Ohio-797, ¶ 21; *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, ¶ 71 (7th Dist.). The fact there is no medical evidence of "damage to a victim's hymen, in light of unequivocal testimony from the victim, does not make the evidence insufficient as a matter of law." *State v. Blankenship*, 8th Dist. Cuyahoga No. 77900, 2001 WL 1617225, *4.

**{¶30}** Moreover, Doerfler explained in her testimony that generally injuries to the hymen and genitals heal quickly. There was no evidence to the contrary.

**{¶31}** The defense also argued that the person referred to as "daddy Chris" committed these offenses, not him, and that T.F.'s mother bribed her with a candy bar and cell phone to blame Appellant. There was evidence that T.F.'s mother had a history of drug abuse and that she and Appellant had separated and had made domestic violence allegations against one another. Hartley also described T.F.'s mother lying to her about rekindling her relationship with Appellant after T.F. made these allegations against him. (Tr. 288.) Regardless, the jury evidently discounted these facts and arguments.

**{¶32}** Further, T.F. testified and her recorded interviews were played during trial. Whether T.F. was telling the truth was for the jury to determine. *State v. Petro*, 148 Ohio St. 473, 501, 76 N.E.2d 355 (1947) (weight to be given evidence and the credibility of the witnesses are jury issues).

**{¶33}** Appellant argues that T.F.'s developmental delays also support the conclusion that she was coached in her testimony. However, as detailed previously, the allegations T.F. made during her recorded interviews were consistent with her trial testimony and were bolstered by her statements to Dr. Teoli. Teoli also explained that T.F. was provided with a bag of dolls during one of her therapy sessions. She described how T.F. took the clothes off the girl doll and adult male doll and demonstrated how "daddy" put his "butthole in her butt." Then she showed Teoli how he put his "butthole" in her "hoo-hoo." T.F. then used ten fingers to show Teoli how many times this happened, both vaginally and anally. (Tr. 524.)

**{¶34}** The references to other men allegedly "marrying" T.F. were not substantiated with any other evidence. Hartley testified on cross-examination that T.F. made a disclosure about "other people" "marrying her," but no details were presented, and there was no indication that these "other people" committed these offenses against T.F., and not Appellant. (Tr. 289, 293-297.) And even assuming these allegations were true, if T.F. were actually raped or sexually abused by others, then this fact does not necessarily require a finding that Appellant did not rape her as well, consistent with T.F.'s testimony. The evidence was before the jury for it to consider.

**{¶35}** Regardless of the defense arguments, upon reviewing the evidence as a whole, it supports the jury's conclusion. T.F.'s testimony was consistent with what she had told her caseworker, therapist, and SANE nurse, who also testified. Also convincing

was T.F.'s seemingly spontaneous use of the anatomically correct drawings during her Harmony House recorded interview to show what Appellant did to her. Her statements and conduct during her recorded interviews did not seem rehearsed but impulsive. The jury was in the best position to judge the credibility of the witnesses.

{¶36} As this court cannot disagree with the factfinder's resolution of the evidence and testimony, we conclude Appellant's convictions are not against the manifest weight of the evidence. Thus, Appellant's first assigned error lacks merit and is overruled.

Second Assignment of Error: Sufficiency of the Evidence

{¶37} Appellant's second assignment of error asserts:

"Whether Appellant's convictions were supported by sufficient evidence, where the State did not present evidence as to the date or timing during which the alleged sexual acts between Appellant and T.F. took place, or as to T.F.'s age at the time of the alleged sexual acts."

{¶38} Whether the evidence is legally sufficient to sustain a verdict is a question of law, which appellate courts review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 3.

{¶39} On appeal we determine whether the evidence presented, viewed in a light most favorable to the prosecution, allows a rational trier of fact to find the essential elements of the crime established beyond a reasonable doubt. *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, *reconsideration denied sub nom. State v. Walker*, 160 Ohio St.3d 1517, 2020-Ohio-6946, 159 N.E.3d 1179.

{¶40} Appellant does not challenge each of the elements necessary for his convictions. He only argues his convictions are not warranted based on insufficient evidence because the state failed to establish the victim's age at the time of the offenses and the state failed to prove the date of the offenses, even if approximate. Because this assignment is limited to these two arguments, our review is equally limited.

{¶41} As stated, Appellant was charged and convicted of two counts of rape of a minor less than ten years old in violation of R.C. 2907.02(A)(1)(b) and R.C. 2907.02(B). Thus, the state was required to establish when the rapes occurred to establish the victim's age at the time of the offense in order to establish rape in violation of R.C.

Case No. 21 BE 0034

2907.02(A)(1)(b). The date of the offenses, actual or approximate, is not an element of the charged crimes.

{¶42} The jury found T.F. was under the age of ten at the time of the offenses via its jury interrogatory. Upon reviewing the record, we agree the state presented sufficient evidence showing Appellant raped T.F. twice before her tenth birthday.

{¶43} During her first recorded interview which was played during trial, T.F. confirms she is six years old and attending kindergarten. T.F.'s second recorded Harmony House interview occurred on November 3, 2020, and it was played at trial. She revealed the rape allegations during her second interview. The Harmony House forensic interviewer Steele also testified that T.F. was six years old at the time of her October 9, 2020 interview. (Tr. 330.)

{¶44} Further, T.F.'s therapist Teoli confirmed that T.F. was seven at the time of trial. Teoli also confirmed that T.F. was born in October of 2013.

{¶45} T.F. underwent a physical examination in December of 2020 when she was seven years old. Doerfler testified the offenses had occurred "several months" before T.F.'s exam. (Tr. 418.) There is no evidence to the contrary.

{¶46} Contrary to Appellant's argument, the state sufficiently established that T.F. was under the age of ten at the time of the offenses. She disclosed the offenses during her November 2020 recorded interview when she was seven, which she reaffirmed via her live testimony during trial.

{¶47} The jury trial was held in July of 2021, and several witnesses confirmed that T.F. was seven years old at the time of trial. There was no evidence disputing her age at the time of the offenses or at trial.

{¶48} Upon viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the age of the victim as under ten years old at the time of the offenses established beyond a reasonable doubt. Thus, this aspect of Appellant's second assignment of error lacks merit.

{¶49} Appellant's second argument here claims that because the state failed to establish *when* the crimes occurred, reversal is required. We disagree.

{¶50} Again, the state was required to establish the age of the victim at the time of the offenses as under ten. The date the offenses occurred is not mentioned in the

statute and is not an element of R.C. 2907.02(A)(1)(b) or R.C. 2907.02(B). In fact, the only case that Appellant advances in support of his argument, *State v. Simmons*, 189 Ohio App.3d 532, 2010-Ohio-3412, 939 N.E.2d 869 (8th Dist.), held in part that it is well settled that "[t]he precise date and time of an offense are generally not elements of an offense." *Id.* at ¶ 23.

**{¶51}** In *Simmons*, a few of the defendant's convictions were reversed because they were not supported by sufficient evidence corresponding with the dates of the charged offenses in the indictment. However, Simmons was indicted and charged with 54 different counts corresponding with several different time periods that were identified in the indictment. Simmons was convicted of 17 counts. *Id.* at ¶ 7. On appeal, he argued there was insufficient evidence to convict him of four particular counts, including aggravated robbery, aggravated burglary, and kidnapping, which allegedly occurred in March of 2008. The court of appeals agreed and found there was no evidence showing Simmons committed any criminal offense during this period. It relied in part on the victim's testimony that Appellant had not stayed with him in March. *Id.* at ¶ 22. Thus, it reversed these four convictions, finding insufficient evidence as a matter of law.

**{¶52}** Appellant's reliance on *Simmons* is misplaced. Unlike *Simmons*, who was facing 54 charges spanning several time periods, Appellant was charged and convicted of two counts of rape during one time period. This is not a case in which Appellant was charged with twenty counts of rape such that the state had to prove the details of the offenses and when they happened to secure multiple convictions of the same offenses. Furthermore, there was no evidence here that Appellant did not have access to T.F. during the timeframe alleged in the indictment. Thus, *Simmons* is distinguishable, and this aspect of Appellant's second assignment of error lacks merit.

**{¶53}** Consequently, we find that the evidence presented by the state was sufficient as a matter of law to support the jury's verdict convicting Appellant of two counts of rape in violation of R.C. 2907.02(A)(1)(b) and R.C. 2907.02(B) with the victim being less than ten years old at the time. Accordingly, Appellant's second assignment of error lacks merit in its entirety.

<u>Third Assignment of Error: Expert Stipulation</u>

**{¶54}** Appellant's third assigned error asserts:

"Whether the trial court erred in allowing testimony from Leslie Doerfler, the state's witness, as to her educational background and qualifications, where the defense had already offered a stipulation as to her qualifications as an expert, the trial court accepted the stipulation on the record, and the witness's additional testimony was prejudicial to Appellant due to a dispute as to the scientific validity of the defense's argument."

**{¶55}** Appellant argues because he stipulated to Leslie Doerfler as an expert, the trial court committed plain error upon permitting her to detail her credentials in violation of the stipulation. Appellant is not challenging her credentials or their relevance but the fact that she recounted them to the jury aiding in her credibility in "violation of the stipulation." Appellant argues this presentation of cumulative evidence prolonged the proceedings, caused juror confusion, and improperly influenced their decision. For the following reasons, we find no error, let alone plain error.

**{¶56}** A stipulation is defined in part as, "[a] voluntary agreement between opposing parties concerning some relevant point * * *." STIPULATION, *Black's Law Dictionary* (11th ed. 2019). The parties did not stipulate or agree that the state would not elicit any testimony about Doerfler's qualifications. Instead, the defense agreed to stipulate that she was qualified as an expert, evidently to prevent the jury from learning about the extent of her qualifications in an effort to reduce the impact of her testimony.

**{¶57}** Further, Appellant points to no law holding a stipulation that a witness is qualified as an expert precludes the introduction of any testimony about that witness's relevant credentials. Instead, the stipulation means the party introducing the witness as an expert is *relieved* from having the witness recite all of her qualifications before she is accepted as an expert—it does not mean one is *prohibited from eliciting* testimony establishing her education and special expertise. *See State v. Hatton*, 5th Dist. Delaware No. 10CAA010012, 2010-Ohio-5419, ¶ 28 (noting that a stipulation "relieved the state from presenting [the expert's] full credentials").

**{¶58}** As alleged, at the beginning of Doerfler's testimony on direct examination, defense counsel stated he would stipulate that she is an expert qualified to testify. In response, the prosecutor immediately asked the court to permit him to obtain testimony from her showing her credentials and education in light of the specialized nature of her testimony and qualifications.

**{¶59}** Doerfler then explained her specialized training and work as a sexual assault nursing examiner or "SANE" nurse, explaining that she is one of only 25 certified pediatric SANE nurses in Ohio, which covers birth to adolescence; one of only 74 certified adolescent SANE nurses in the state; and a SANE nursing instructor. Doerfler was not asked about her undergraduate degree, work history, or other less pertinent experience.

**{¶60}** The defense opening statement confirms that part of counsel's argument was that there was no physical evidence supporting the victim's allegations. The defense counsel instead pointed out that T.F.'s physical exam showed she had an intact hymen, no scarring, and no damage found during her physical exam despite being allegedly anally and vaginally raped by an adult male ten times. Defense counsel also stressed in his opening statement that the minor likewise did not have any anal tears, stating that this was "impossible" if the allegations were true. (Tr. 247.)

**{¶61}** Contrary to this argument, however, Doerfler testified about how quickly vaginal injuries heal and that she does not typically see physical damage or injury depicting abuse in most cases involving young children when she conducts the SANE exam. (Tr. 427.) There was no competing evidence on this topic.

**{¶62}** Notwithstanding, defense counsel attempted to discredit Doerfler on cross-examination, eliciting testimony establishing that she tends to testify on behalf of the state, and not defendants.

**{¶63}** Moreover, Appellant's argument overlooks that during trial the prosecutor requested and was granted permission to highlight Doerflor's credentials despite the defense stipulation. Knowing a witness's credentials aids in the weight to give that particular person's testimony. This does not create confusion but lends clarity. *See* 3 Crim. Prac. Manual, *Qualifying, challenging the expert—Stipulating to credentials*, Section 86:8 (2021). While an "expert witness is not required to be the best witness on the subject. * * * The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth." *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 383 N.E.2d 564 (1978). The result Appellant urges us to adopt does not aid the trier of fact in the search for the truth.

**{¶64}** Regardless of the defense stipulation as to her qualifications as an expert, the court did not err upon allowing her to detail her most compelling qualifications to

establish the weight to be given to her testimony. Accordingly, this argument lacks merit and is overruled.

<u>Fourth Assignment of Error: Ineffective Assistance of Trial Counsel</u>

**{¶65}** Appellant's fourth assignment of error claims:

"Whether the failure of Appellant's trial counsel to object to the additional testimony from Leslie Doerfler following the trial court's acceptance of Appellant's stipulation to Doerfler as an expert witness, as to Doerfler's education, licensing, and other qualifications to be an expert witness, constituted ineffective assistance of counsel, where Doerfler's testimony was critical to the jury's determination of whether Appellant could have engaged in 'sexual conduct' with T.F., and thus whether the State met its burden as to one of the essential elements of the charge of rape."

**{¶66}** Appellant contends he was denied the effective assistance of trial counsel based on his attorney's failure to object to the state's elicitation of Doerfler's qualifications as outlined in assigned error number three.

**{¶67}** To establish a claim of ineffective assistance of counsel, a defendant must show both that his trial counsel's performance was deficient in that it fell below an objective standard of care and that the deficient performance resulted in prejudice. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

**{¶68}** Licensed attorneys in Ohio are presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential because of the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. In fact, appellate courts are prohibited from second-guessing trial counsel's strategic decisions. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

**{¶69}** Here, Appellant cannot prove either prong, and as such, this assigned error lacks merit.

**{¶70}** First, as detailed in Appellant's third assignment of error, we find no error in his counsel's failure to object. In fact, although Appellant's trial counsel sought to use the stipulation to limit the jury's knowledge of Doerfler's expertise in her field, the prosecutor

<u>Case No. 21 BE 0034</u>

sought the trial court's permission to review her credentials anyway. Once permission was granted, any subsequent objection to the admission of Doerfler's experience and credentials would have likely been overruled as already addressed. Moreover, as pointed out, the extent of Doerfler's training likely aided the trier of fact.

**{¶71}** Thus, Appellant's trial counsel did not err in failing to object, and thus, Appellant's argument fails to satisfy the first prong. Without error, Appellant cannot show resulting prejudice.

**{¶72}** Because Appellant fails to establish that his trial counsel erred, we do not need to address the second prong of the test, i.e., whether his lawyer's deficient performance was so serious that there is a reasonable probability the outcome of the proceeding would have been different. *Carter* at 558. Accordingly, this assignment of error is overruled.

Fifth Assignment of Error: Right to Confront Out of State Witness

**{¶73}** Appellant's fifth assignment of error contends:

"Whether the trial court abused its discretion in granting the State's motion to take Cody Porter's testimony by video deposition, where the state failed to show that Porter was 'unavailable' as defined under Evid.R. 804 and Crim.R. 15, and where the State failed to show that it had used 'reasonable means' to secure Porter's appearance in court to testify."

**{¶74}** Appellant contends that his constitutional right to confront the witness was violated based on the court's decision to allow Porter to testify remotely via videoconference technology. Appellant also argues that the court erred in allowing the state to present Porter's testimony by way of pre-recorded deposition. Because Porter did not testify by way of deposition, we disregard this aspect of his argument.

**{¶75}** The state moved to allow Porter to testify either via deposition or videoconference. The defense objected to Porter's out of court testimony, arguing the state had almost a month to secure his in-person testimony and Appellant was being denied his right to fully confront this witness. The state countered that it did not have enough time to secure Porter's transport from Minnesota. Additionally, the state emphasized the prison Porter was incarcerated in was in the middle of a Covid-19 outbreak. The court overruled the state's request to allow his testimony to be pre-

Case No. 21 BE 0034

recorded and out of the presence of the jury by way of deposition, but allowed Porter to testify by live videoconference or Zoom. (Tr. 686-7.)

{¶76} Appellant first contends the trial court violated Crim.R. 15 and Evid.R. 804 by not having Porter testify in person, arguing that Porter was not "unavailable" to testify. Evid.R. 804(B)(1) addresses hearsay and states that "former testimony" is an exception to the rule against hearsay "if the declarant is unavailable as a witness" to testify. And Crim.R. 15(F) addresses the use of deposition testimony during a criminal trial and permits its use if the witness is unavailable. Appellant also relies on this Court's decision in *State v. Oliver*, 7th Dist. Mahoning No. 07 MA 169, 2008-Ohio-6371, which analyzed whether a deposition was properly used and admitted during Oliver's trial. *Id.* Here, Appellant claims the state did not take reasonable efforts to secure Porter's testimony in person, and as such, he was not "unavailable" as that term is defined in Evid.R. 804(A).

{¶77} As indicated, the state did not present Porter's testimony at trial via deposition and did not present any former testimony. Instead, the trial court allowed the state to introduce Porter's testimony via live remote videoconference technology. Thus, Appellant's argument invoking *Oliver*, Crim.R. 15, and Evid.R. 804, which deal with the use of deposition testimony and former testimony, is not controlling. Even assuming arguendo that these authorities apply, this Court in *Oliver* upheld the use of a witness' deposition testimony despite conflicting evidence as to her availability at the time of trial. *Id.* at 43-45. Further, the state explained here that it did not have sufficient time to secure Porter's transport from the Minnesota facility and that bringing this witness to Ohio to testify was not feasible because the facility he was incarcerated in was experiencing a surge of Covid-19 cases. Thus, assuming these authorities governing the use of deposition testimony at trial are applicable, Porter was sufficiently "unavailable" in light of his incarceration in a different state that was undergoing a surge of infections during a worldwide pandemic. *Id.*

{¶78} The second aspect of this assigned error argues that Appellant's federal and Ohio Constitutional rights to confront Porter were violated by permitting Porter to testify remotely instead of in person. We review confrontation clause arguments de novo and without deference to the trial court's decision. *State v. Toney*, 7th Dist. Mahoning No. 14 MA 0083, 2016-Ohio-3296, ¶ 45.

**{¶79}** The overriding purpose of the confrontation clause is to afford the accused the opportunity to confront and cross-examine the witnesses who testify against him to ensure and test the reliability of the testimony. *State v. Self,* 56 Ohio St.3d 73, 76, 564 N.E.2d 446 (1990).

**{¶80}** The Sixth Amendment to the United States Constitution states in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." U.S. Constitution, Amendment VI.

**{¶81}** The Ohio Constitution states in pertinent part: "In any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *." Ohio Constitution, Article I, Section 10. Notwithstanding the different language employed in each confrontation clause, the Ohio Supreme Court has explicitly held that "Section 10, Article I provides no greater right of confrontation than the Sixth Amendment." https://1.next.westlaw.com/Link/RelatedInformation/Flag?documentGuid=I638a4e1ed45411d98ac8f235252e36df&transitionType=InlineKeyCiteFlags&originationContext=docHeaderFlag&Rank=1&ppcid=251066e99e3148d38186d231232ad7d0&contextData=(sc. Recommended)*Self, supra*, at 79.

**{¶82}** "Although face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' * * * it is not the *sine qua non* of the confrontation right." *Maryland v. Craig*, 497 U.S. 836, 847, 110 S.Ct. 3157 (1990). The preference of face-to-face testimony, * * * "'must occasionally give way to considerations of public policy and the necessities of the case * * *.'" *Id.* quoting *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337 (1895). And any exceptions must be narrowly drawn and "physical confrontation may constitutionally be denied where the denial is necessary to further an important public policy and 'the reliability of the testimony is otherwise assured.'" https://1.next.westlaw.com/Link/RelatedInformation/Flag?documentGuid=I638a4e1ed45411d98ac8f235252e36df&transitionType=InlineKeyCiteFlags&originationContext=docHeaderFlag&Rank=1&ppcid=251066e99e3148d38186d231232ad7d0&contextData=(sc. Recommended)*Self,* 56 Ohio St.3d at 77, quoting https://1.next.westlaw.com/Link/RelatedInformation/Flag?documentGuid=I638a4e1ed45411d98ac8f235252e36df&transitionType=InlineKeyCiteFlags&originationContext=docH

eaderFlag&Rank=1&ppcid=251066e99e3148d38186d231232ad7d0&contextData=(sc. Recommended)*Craig*, 497 U.S. at 850.

**{¶83}** The Ohio Supreme Court in *Self* found the closed-circuit television and videotape recording technologies by which the victim testified there, *were* sufficient and allowed the "defendant to exercise the right of cross-examination and to observe the proceedings against him with the same particularity as if he and the witness were in the same room." *Id.* at 79. Since the decision in *Self*, other Ohio courts have also authorized the presentation of testimony via remote videoconferencing technologies, such as Skype and Zoom, in limited circumstances. *See State v. Banks*, 1st Dist. Hamilton No. C-200395, 2021-Ohio-4330; *State v. Castonguay*, 2nd Dist. Darke No. 2021-CA-2, 2021-Ohio-3116.

**{¶84}** To determine whether an alternative to physical face-to-face confrontation is warranted, several Ohio courts have employed a two-prong test derived from *Craig, supra*., *Banks*, *supra*, ¶ 22; *State v. Howard*, 2020-Ohio-3819, 156 N.E.3d 433, ¶ 53 (2d Dist.); *Castonguay, supra,* at ¶ 35. When deciding whether an exception to the confrontation clause is warranted, a court must first consider whether the procedure is "justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and[,] * * * [second ensure whether the procedure] satisf[ies] the other three elements of confrontation–oath, cross-examination, and observation of the witness' demeanor." *Banks*, *supra*, at ¶ 22, quoting *Howard*, *supra*.

**{¶85}** In *Howard*, the Second District agreed with the trial court's decision to allow one of the victims to testify via live remote teleconferencing. There, the witness had suffered a gunshot wound leaving him paralyzed, which made travel from his home in Nevada to Ohio very difficult, and it was also against the advice of his doctors. *Id.* at ¶ 53-57. Moreover, the appellate court agreed that the reliability of his testimony was ensured, noting that the audio and visual aspects were both of good quality and that the witness was under oath and subject to cross-examination. *Id.* at ¶ 60-61. *Accord State v. Castonguay*, 2nd Dist. Darke No. 2021-CA-2, 2021-Ohio-3116, ¶ 40 (finding no violation of constitutional right to confront witnesses by use of remote trial testimony); *State v. Johnson*, 195 Ohio App.3d 59, 2011-Ohio-3143, 958 N.E.2d 977, ¶ 58-67 (1st Dist.) (finding two-way closed circuit television was reliable and witnesses testified under

oath, were subject to live cross-examination, and were visible in the courtroom during their testimony); *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, ¶ 22 (finding no confrontational clause violation by use of live video link for a key prosecution witness to testify from Belgium).

**{¶86}** In *Banks, supra*, the First District affirmed the use of a witness' remote testimony where the witness did not receive his subpoena for trial but otherwise was available to attend. The court rejected the witness' reasons as inadequate to excuse his in-person testimony but nevertheless found no constitutional violation because the trial court was in a county on Covid-19 "red alert level three" at the time during a pandemic and was directed via administrative order to employ technology and remote testimony when feasible. *Id.* at ¶ 23-25.

**{¶87}** Upon applying the first prong of the test here, Porter was incarcerated in Minnesota during a pandemic, and at the time, the facility was experiencing a surge in Covid-19 cases of the then new Delta variant. Preventing the infection of the judge, court staff, jury, and parties is a significant public policy reason warranting the remote testimony of Porter. An out of state witness from a prison where cases of a new variant were increasing is a significant consideration that necessarily warrants invoking an exception to the physical aspect of the confrontation clause, especially in light of the advanced live two-way technology available when this case was tried. This conclusion is true regardless of whether or not the state erred by failing to timely secure his transport.

**{¶88}** Although remote videoconference testimony is not preferable over in-person testimony, here, it was limited to one witness and served an important policy reason. Consistent with this conclusion, the Ohio Supreme Court issued administrative orders in response to Covid-19, encouraging the use of technology to conduct trials and proceedings remotely. *07/31/2020 Administrative Actions*, 159 Ohio St.3d 1461, 2020-Ohio-3861, 150 N.E.3d 107; *see also United States v. Smith*, 6th Cir. No. 21-5432, 2021 WL 5567267, *2 (Nov. 29, 2021) (trial court has inherent authority to employ reasonable and necessary safety measures during a public health emergency).

**{¶89}** As for the second prong of the test, the other three elements of confrontation were satisfied here as well, i.e., oath, cross-examination, and observation of the witness'

demeanor. It is undisputed Porter gave his testimony under oath and Appellant's counsel had the opportunity to cross-examine him.

**{¶90}** As for the third confrontation element, Appellant and his counsel were able to observe Porter's demeanor during his testimony. In making this argument, Appellant's brief indicates that he could not see Porter during his testimony. However, the state specifies in its brief that Appellant could see Porter during his remote testimony. Thereafter, Appellant's reply brief does not oppose this statement or challenge it with reference to the record.

**{¶91}** The prosecutor also made the following statement during trial:

[T]he record should reflect that the witness will be able to see - - the way that the court administrator has the camera focused will be able to see the defendant, defense counsel and the questioner. * * * So therefore, the ability to confront the witness against him is going to be there, and the defendant will not be prejudiced * * *.

(Tr. 687.) Immediately thereafter, defense counsel was offered an opportunity to respond and did *not* indicate that Appellant could not see the witness. Neither defense counsel nor Appellant indicated on the record that Appellant could not see Porter. (Tr. 687.) Moreover, Porter was asked to identify Appellant during his testimony via videoconference; he did so and described where Appellant was seated. (Tr. 692.)

**{¶92}** A similar argument was raised in *Howard*, *supra*, which the Second District rejected, explaining: "neither Howard nor his attorney voiced any concern during the trial regarding Howard's ability to see or hear that testimony. We can find no error where nothing in the record supports an inference that Howard actually experienced difficulty seeing or hearing Coleman's testimony." *Id.* at ¶ 62.

**{¶93}** Like *Howard*, Appellant's contention that he could not see Porter during his testimony is not established with reference to the record nor could we find evidence supporting this allegation. Appellant has the burden of directing this court's attention to record evidence in support of his claim and fails to do so here. Thus, we disregard it. App.R. 16(A)(3) ("The appellant shall include in its brief * * * reference to the place in the record where each error is reflected."); *In re Jones*, 9th Dist. Summit No. 20306, 2001 WL 458682, *5 (The burden of demonstrating error is on the appellant); App.R. 12(A)(2).

**{¶94}** Consequently, these additional safeguards were satisfied, Porter's testimony was sufficiently reliable, and the second prong of the test is satisfied. *Maryland v. Craig*, 497 U.S. 836, 847, 110 S.Ct. 3157 (1990). Thus, Appellant's confrontational rights were not violated, and this assignment of error lacks merit.

**{¶95}** Last, assuming for the sake of argument that Appellant's right to confront Porter was violated, it is well settled the denial of face-to-face confrontation is not a structural error. Thus, it is subject to harmless-error analysis. *Coy v. Iowa*, 487 U.S. 1012, 1021, 108 S.Ct. 2798, (1988); *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020). Accordingly, we review the trial court's decision to allow Porter to testify remotely only for harmless error. *Id.; United States v. Smith*, *supra*, at *3. An error does not require reversal and is harmless if the state can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824 (1967).

**{¶96}** Porter's testimony, although relevant to show Appellant's identity and helpful in overcoming the defense's argument, bolstered the fact Appellant was the perpetrator of these acts against T.F. Porter's testimony did not provide evidence establishing the elements of the charged offenses. There is nothing suggesting the jury's verdict may have been different if Porter had testified in person during trial, and as such, this court cannot find that Porter's remote testimony unfairly prejudiced Appellant. *See State v. Banks*, 1st Dist. Hamilton No. C-200395, 2021-Ohio-4330, ¶ 26 (finding no error but if there were error, it was harmless). Thus, this court concludes the trial court's alleged error, to the extent it was an error at all, was also harmless. *Id.*; *State v. Castonguay*, 2nd Dist. Darke No. 2021-CA-2, 2021-Ohio-3116, ¶ 41 (even assuming error, remote testimony by three witnesses was harmless).

**{¶97}** Accordingly, Appellant's fifth assignment of error lacks merit in its entirety and is overruled.

Sixth Assigned Error: Other Acts Evidence

**{¶98}** Appellant's sixth assignment of error asserts:

"Whether the trial court's decision to allow 'other acts' testimony from two of the state's witnesses, Adrienne Nelson and Cody Porter, was an abuse of discretion, where

the nature of the testimony was highly prejudicial to Appellant, and where the prejudice to Appellant outweighed the probative value of the evidence, pursuant to Evid.R. 403(B)."

**{¶99}** The state filed a notice of intent to use other acts evidence in advance of trial in order to show Appellant's modus operandi and his identity. Appellant claims the trial court abused its discretion by admitting the "other acts" testimony of witnesses Adrienne Nelson and Cody Porter. He claims their testimony was unfairly prejudicial and cumulative evidence, which was not warranted because the minor victim had already testified in advance of these witnesses, and she already identified Appellant.

**{¶100}** Trial courts have broad discretion to allow other-acts evidence that is admissible under Evid.R. 404(B). *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, *cert. denied,* 142 S.Ct. 147; *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 17. Consequently, we review these decisions for an abuse of discretion. An abuse of discretion reflects that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 59 (1990).

**{¶101}** When considering other acts evidence, trial courts should make three determinations. First, it should determine if the evidence is relevant and second, whether the evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). Finally, the court must decide whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Williams*, *supra*, at ¶ 20; Evid.R. 403(B).

**{¶102}** "To be admissible to prove identity through a certain modus operandi*,* other-acts evidence must be related to and share common features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). Modus operandi evidence is relevant to prove identity if the evidence of the defendant's other crimes entails the same peculiar or distinctive method of doing something that it tends to identify the defendant as the perpetrator of the crime at issue. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 35-37.

**{¶103}** The trial court instructed the jury before both Porter and Nelson's testimony that their testimony was not to be considered to establish that Appellant acted in conformity with his prior conduct.

{¶104} Nelson testified that when she was about six years old, she lived in the same apartment building as Appellant and was a friend of his children. On one occasion, she recalls visiting their apartment, but Appellant's children were sleeping. Appellant sexually assaulted her, and she remembers him spitting saliva into his hand and putting it on his penis. (Tr. 584-589.)

{¶105} Porter testified that Appellant is his biological father and that Porter lived with him until Appellant raped him when Porter was still a child. Porter recalls Appellant spitting on his hand and then putting it on his penis before committing the offense. Porter also revealed that, at the time of his testimony, he was incarcerated in a Minnesota correctional facility for committing a sexual felony against an 11-year-old girl. (Tr. 687-702.)

{¶106} Here, the court correctly found that the other acts evidence consisting of Nelson's and Porter's testimony about the way Appellant spit on his hand before sexually abusing them was relevant and admissible to show Appellant's identity, one of several permissible grounds set forth in Evid.R. 404(B). Their stories contained common features with the crimes in question.

{¶107} As for whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, we cannot find that the trial court abused its discretion. The probative value of Nelson's and Porter's testimony was significant in this case because part of the defense theory was T.F. was actually sexually abused by another individual, referred to as "daddy Chris," and not Appellant. Their testimony was also important because the victim's credibility was subject to attack in light of the fact that she was only seven years old; had learning and/or developmental delays; and was facing the additional defense argument that her mother was bribing her in order to get back at Appellant based on their contentious history with one another.

{¶108} Moreover, T.F.'s identification of Appellant during trial seemed wholly unplanned. As stated, the victim testified in another room and asked to see Appellant through the monitor only after hearing him cough. Only then did the prosecution ask T.F. to identify Appellant. (Tr. 569.)

{¶109} While undoubtedly damaging, the purpose of Nelson's and Porter's testimony was designed to rebut the defense attempts to undermine T.F.'s credibility and

to solidify the identity of Appellant as the perpetrator based on his modus operandi. Thus, we cannot conclude that the trial court's decision in allowing this testimony was arbitrary or capricious and that the prejudicial effect of this evidence substantially outweighed the probative value of the testimony such that exclusion was required under Evid.R. 403(A).

**{¶110}** Accordingly, the trial court did not abuse its discretion, and Appellant's sixth assigned error lacks merit.

Seventh Assignment of Error: Lesser Included Offenses

**{¶111}** Appellant's seventh assignment of error argues:

"Whether the trial court's decision not to allow a jury instruction on the lesser included offenses of Attempted Rape and Gross Sexual Imposition was an abuse of discretion, where the evidence did not conclusively show the nature of the alleged sexual acts between T.F. and Appellant, where the offenses were lesser included offenses of the charge offense of Rape, and where Appellant was prejudiced by the trial court's decision, since the evidence would have allowed the jury to reach a guilty verdict on either of the two lesser included offenses."

**{¶112}** Appellant argues the trial court abused its discretion by not instructing the jury on the lesser included offenses of attempted rape and gross sexual imposition. We disagree.

**{¶113}** Jury instructions are generally left to the discretion of the trial court, and thus, we apply the abuse of discretion standard when reviewing a decision not to instruct the jury in a certain manner. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989); *State v. Cain*, 10th Dist. Franklin No. 06AP-1252, 2007-Ohio-6181, ¶ 7.

**{¶114}** At trial, defense counsel asked for jury instructions for attempted rape and gross sexual imposition. The trial court overruled the request explaining that it did not believe there was evidence to substantiate the lesser included offense instructions. (Tr. 714.)

**{¶115}** Gross sexual imposition is a lesser-included offense of rape. *State v. Johnson,* 36 Ohio St.3d 224, 522 N.E.2d 1082 (1988)*,* paragraph one of the syllabus. *Accord State v. Gale,* 10th Dist. Franklin No. 05AP-708, 2006-Ohio-1523, ¶ 14 ("Gross sexual imposition is a lesser-included offense of rape when based on the same conduct: its elements are identical to rape except that the type of sexual activity involved

in gross sexual imposition is 'sexual contact,' while 'sexual conduct' is necessary for a rape conviction.").

**{¶116}** Attempted rape is also a lesser included offense of rape. *State v. Williams,* 74 Ohio St.3d 569, 578, 660 N.E.2d 724 (1996). Ohio's general attempt statute states, "[n]o person, purposely or knowingly, * * * shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).

**{¶117}** However, just because an offense is a lesser included one does not entitle a defendant to an instruction. *State v. Daniel*, 8th Dist. Cuyahoga No. 103258, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 32. The Ohio Supreme Court set forth a test for when the trial court is *required* to give the jury an instruction on a lesser-included offense: "[i]f the trier of fact could reasonably find against the state and for the accused upon one or more of the elements of the crime charged and for the state on the remaining elements, which by themselves would sustain a conviction on a lesser-included offense, then a charge on the lesser-included offense is required." *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, ¶ 20, quoting *State v. Kilby*, 50 Ohio St.2d 21, 361 N.E.2d 1336 (1977). "Conversely, if the jury could not reasonably find against the state on an element of the crime, then a charge on a lesser-included offense is not only not required, but is also improper." *Id.*

**{¶118}** Here, the state's case was narrowly focused, and it chose to prosecute solely for the offenses of rape. It charged Appellant with two counts of rape during the time period alleged, and the state had the burden to prove each of the elements beyond a reasonable doubt.

**{¶119}** Appellant argues the lesser offense instructions were warranted since the victim's terms used in describing the offenses created confusion about what actually occurred. As previously detailed, T.F. used the word "marrying" or "marry" to describe what Appellant had done, and she referred to her vagina as her "hoo-hoo" and "hoo-haw." She also called a penis a "butthole." Without explanation, these terms do create confusion. However, the state fully elicited testimony from T.F., as well as Teoli and Steele, confirming what T.F. meant when she used these terms. And T.F.'s trial testimony plus the testimony of the other state witnesses left no doubt as to what T.F. was alleging that Appellant did.

**{¶120}** Steele described during his testimony what T.F. meant by these terms. (Tr. 350-373.) Teoli described at trial that T.F. took the clothes off the girl doll and adult male doll and demonstrated how Appellant put his "butthole in her butt." Then she showed Teoli how he put his penis in her "hoo-hoo." T.F. then used ten fingers to show Teoli how many times this happened, both vaginally and anally. (Tr. 524.)

**{¶121}** Most damning is T.F.'s trial testimony during which she said that Appellant put his genitals in her mouth, rectum, and her "hoo hah" "like ten times" with his pants down. She said it was inside of her and "hurt a lot." She also described Appellant putting his fingers to his mouth and putting spit on his "butthole," meaning his penis, before putting it in her. (Tr. 559-563.)

**{¶122}** T.F.'s version was consistently repeated during trial and entails Appellant putting his "butthole" in her "rectum" and "in" her "hoo-hoo." The evidence does not depict failed attempts and does not show that Appellant had only touched her genitals. Had the state not established every element of the charged rape offenses, Appellant would have been entitled to acquittal. *State v. Johnson*, 36 Ohio St.3d 224, 228, 522 N.E.2d 1082 (1988). Because the lesser-included offense instructions were not required here, this assigned error lacks merit.

Eighth Assignment of Error: Statements Made at Sentencing

**{¶123}** Appellant's eighth and final assignment of error asserts:

"Whether the trial court abused its discretion in allowing Jessica Hartley from Belmont County Job and Family Services to testify at Appellant's sentencing hearing regarding her interactions with Appellant, where the statements went beyond the content of a victim impact statement and were prejudicial to Appellant."

**{¶124}** Appellant challenges the statements of Jessica Hartley made during his sentencing hearing, claiming the trial court abused its discretion in allowing her allegations about him. He claims that the admission of her testimony is outside the scope of victim impact statements allowed by Marsy's Law and Crim.R. 32(A)(3) and were prejudicial. Appellant seeks resentencing.

**{¶125}** Contrary to Appellant's argument, other individuals are permitted to speak at sentencing hearings with the court's permission. R.C. 2929.19(A) states in part: "At the [sentencing] hearing, the offender, the prosecuting attorney, the victim or *the victim's*

*representative * * *,* and, *with the approval of the court, any other person may present information relevant to the imposition of sentence* in the case." (Emphasis added.) R.C. 2929.19(A).[1]

**{¶126}** And, although Crim.R. 32(A) and the Ohio constitutional amendment known as Marsy's Law require the victim of an offense to be afforded an opportunity to speak at the sentencing hearing, neither precludes the introduction of statements from other individuals. Ohio Constitution, Article I, Section 10a.

**{¶127}** As stated, Hartley was T.F.'s family's intake caseworker at the county's Department of Job and Family Services. At sentencing, the state offered Hartley to speak as a "form of a victim impact statement" with the court's permission, and she conveyed her opinion about Appellant's detrimental effects on T.F. and concerns for T.F.'s troubled future dealing with the impact of her sexual abuse. Hartley also recounted her own negative experiences with Appellant while working with T.F. and awaiting Appellant's trial. Hartley said that Appellant tried to intimidate her during the court proceedings, and that he even sought to have her and her husband murdered before the case went to trial. The trial court permitted these statements despite a defense objection.

**{¶128}** The court acted consistent with R.C. 2929.19(A) by permitting Hartley to speak at the hearing either as the victim's representative or as another individual with relevant information.

**{¶129}** However, to the extent Hartley conveyed arguably new material information during her statement about Appellant's plot to have her killed, the court should have disregarded this information when fashioning Appellant's sentence pursuant to R.C. 2930.14(B), which states:

> The court shall consider a victim's statement made under division (A) of this section along with other factors that the court is required to consider in imposing sentence or in determining the order of disposition. If the statement includes new material facts, the court shall not rely on the new

---

[1] Another aspect of R.C. 2929.19 was found unconstitutional on unrelated grounds by *State v. Oliver*, 12th Dist. No. CA2020-07-041, 2021-Ohio-2543, 176 N.E.3d 1054, ¶ 54, *appeal not allowed,* 165 Ohio St.3d 1504, 2022-Ohio-85, __ N.E.3d. __.

material facts unless it continues the sentencing * * * or takes other appropriate action to allow the defendant * * * an adequate opportunity to respond to the new material facts.

(Emphasis added.)

**{¶130}** There is no indication here that the trial court actually relied on Hartley's statement about her negative dealings with Appellant when the court determined his sentence. Moreover, a trial court is presumed to have considered only the competent and material evidence. *See generally State v. Sanders*, 92 Ohio St.3d 245, 267, 750 N.E.2d 90 (2001) (finding no plain error in a capital case because a trial judge is presumed to have only considered the competent and material evidence).

**{¶131}** Further, Appellant had the opportunity to speak at his sentencing after Hartley's statement, and he did not dispute this allegation.

**{¶132}** Finally, Appellant's two, consecutive life sentences without the possibility of parole are more than warranted here based on the evidence in the record, the victim impact, and the information detailed in Appellant's presentence investigation report. Thus, even assuming the court erred in allowing Hartley's statement about Appellant's murder plot, we find no prejudicial error warranting reversal. *See State v. Goodnight*, 11th Dist. Lake No. 2008-L-029, 2009-Ohio-2951, ¶ 60 (finding no prejudice flowing from an inappropriate statement made at sentencing). Appellant's final assignment of error lacks merit and is overruled.

Conclusion

**{¶133}** In conclusion, each of Appellant's eight assigned errors lack merit, and as such, the trial court's decision is affirmed in its entirety.

.

Donofrio, P J., concurs.

Waite, J., concurs.

Case No. 21 BE 0034

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**